UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ROBERT N. CAPPIELLO,                              :
                                                  :
                                                  :
                                                  :
                        Plaintiff,                :
                                                  :
        -against-                                 :      CV-08-02417(ADS)(ETB)
                                                  :
ICD PUBLICATIONS, INC. and DAVID                  :
PALCEK,,,                                         :
                                                  :
                                                  :
                                                  :
                                                  :
                        Defendants.               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**DEFENDANTS' POST-TRIAL MEMORANDUM OF LAW**


                          **CLAUSEN MILLER, P.C.**
                          *Attorneys for Defendants*
                          *ICD PUBLICATIONS, INC. and DAVID PALCEK*
                          One Chase Manhattan Plaza
                          New York, New York  10005
                          (212) 805-3977

Of Counsel:

Edward M. Tobin(EMT6592)


285094.1

## TABLE OF CONTENTS

| | |
|---|---|
| I.   PRELIMINARY STATEMENT ................................................................. 1 | |
| II.  FACTUAL BACKGROUND .................................................................. 2 | |
| III. ARGUMENT.......................................................................................... 8 | |
| PLAINTIFF COMMITTED NUMEROUS FRAUDULENT, DISHONEST, AND DISLOYAL ACTS WARRANTING HIS TERMINATION FROM DEFENDANT ICD FOR "CAUSE", AS DEFINED IN THE EMPLOYMENT AGREEMENT ........................... 9 | |
| I.   Plaintiff's failure to advise Defendant ICD that his "home" office was not, in fact, Plaintiff's residence constituted a fraudulent, dishonest and disloyal act warranting the termination of the Employment Agreement.................................................................. 11 | |
| II.  Plaintiff's failure to acquire a contact name for HGTV from a former colleague at Reed Publications to pursue their participation in the Housewares Design Awards and his representation to Defendant ICD that he did, in fact, do so constituted acts of disloyalty and dishonesty warranting the termination of the Employment Agreement........................ 12 | |
| III. Plaintiff's failure to oversee and maintain the accounts of several ICD advertisers, resulting in the loss of at least one account, constituted an act of disloyalty and dishonesty warranting the termination of the Employment Agreement. .................................................. 12 | |
| IV. Plaintiff's failure to complete the editorial calendars and rate sheets for ICD's publications for the 2008 fiscal year constituted an act of disloyalty and dishonesty warranting the termination of the Employment Agreement. .................................................. 13 | |
| V.  Plaintiff's failure to represent ICD at a hotel industry trade show in New York, New York by engaging with potential advertisers or customers during the trade show constituted an act of disloyalty and dishonesty warranting the termination of the Employment Agreement........................................................................................ 13 | |
| VI. Plaintiff's failure to create a conference for high level executives in the hospitality industry when instructed to do so constituted an act of disloyalty dishonesty warranting the termination of the Employment Agreement.............................................................. 14 | |
| VII. Plaintiff's conversation with William McGloughlin in December, 2007, wherein he advised another ICD employee that it was not his intention to utilize    best efforts on behalf of Defendant ICD business, constituted an act of dishonesty and disloyalty warranting the termination of the Employment Agreement.............................................................. 14 | |
| DEFENDANT PALCEK WAS AT ALL TIMES ACTING WITHIN THE SCOPE OF HIS DUTIES AS PRESIDENT AND CHIEF EXECUTIVE OFFICER OF DEFENDANT ICD AND CANNOT, AS A MATTER OF LAW, BE DEEMED TO HAVE TORTIOUSLY INTERFERED WITH THE EMPLOYMENT AGREEMENT ................................... 15 | |
| PLAINTIFF HAS FAILED TO MITIGATE HIS DAMAGES IN THIS ACTION............ 18 | |
| PLAINTIFF HAS FAILED TO SUBMIT ANY CORROBORATING EVIDENCE THAT HE IS ENTITLED TO DAMAGES FOR HEALTH INSURANCE PREMIUMS............... 19 | |
| SHOULD THE COURT DETERMINE THAT DEFENDANT ICD BREACHED THE EMPLOYMENT AGREEMENT, PLAINTIFF IS NOT ENTITLED TO RECEIVE INTEREST FOR ANY COMPENSATORY DAMAGES INCURRED BETWEEN JANUARY 31, 2008 AND THE PRESENT.............................................................. 19 | |
| CONCLUSION ........................................................................................ 22 | |

i

## TABLE OF AUTHORITIES

### Cases

<u>Abra Construction Corp., v. 112 Duane Associates, LLC</u>, 59 A.D. 3d 263, 873 N.Y.S. 2d 574 (1st Dept. 2009) ........................................................................................................... 19

<u>Bimba Mfg. Co. v. Starz Cylander Co., et al.</u>, 256 N.E. 2d 357, 119 Ill. App. 2d 251 (1st Dist. 1970) ...................................................................................................................... 19

<u>Boock v. Napier, et al.</u>, 120 N.E. 2d 244, 3 Ill. app. 2d 19 (1st District 1954) ..................... passim

<u>Carey Electric Contracting, Inc. v. First National Bank of Elgin</u>, 392 N.E. 2d 759, 74 Ill. App. 3d 233 (1979) ........................................................................................................... 11

<u>Central Illinois Light Co. v. Stenzel</u>, 195 N.E. 2d 207, 44 Ill. App. 2d 388 (3d Dist. 1963) ....... 19

<u>Cornell v. T.V. Development Corp., et al.</u>, 215 N.E. 2d 349, 268 N.Y.S. 2d 29 (1966).............. 18

<u>Dallis v. Don Cunningham and Associates</u>, 11 F. 3d 713 (Ill. 1993) ........................................ 20

<u>Golden, et al. v. Worldvision Enterprises, Inc.</u>, 133 A.D. 2d 50, 519 N.Y.S. 2d 1 (1st Dept. 1987) ........................................................................................................................... passim

<u>Harrison v. Sears, Roebuck & Company, et al.</u>, 546 N.E. 2d 248, 189 Ill. App. 3d 980 (4th Dist. 1989) .................................................................................................................................. 9

<u>Haslund v. Simon Proprty Group, Inc.</u>, 378 F. 3d 653 (7th Cir. 2004) ..................................... 20

<u>Hooker, et al. v. The Retirement Board of the Firemen's Annuity and Benefit Fund of Chicago</u>, 907 N.E. 2d 447, 329 Ill. App. 3d 129 (First Dist. 2009) .......................................... 20

<u>Hunter v. Greene</u>, 734 F. 2d 896, 901 (2d Cir. 1984) ............................................................ 15

<u>In Re: Estate of Neprozatis</u>, 378 N.E. 2d 1345, 62 Ill. app. 3d 563 (1978).............................. 11

<u>Johnstowne Centre Partnership v. Chin</u>, 458 N.E. 2d 480, 99 Ill. 2d 284 (1983) ......................... 9

<u>Lazard Freres & Co. v. Protective Life Ins. Co.</u>, 108 F. 3d 1531, 1539-41 (2d Cir. 1997).......... 15

<u>Marks v. Smith, et al.</u>, 65 A.D. 3d 911, 885 N.Y.S. 2d 463 (1st Dept. 2009) ........................ 16, 17

<u>Miller v. Ojima</u>, 354 F. Supp. 2d 220 (E.D.N.Y. 2005) ........................................................ 16

<u>Movitz v. First National Bank of Chicago</u>, 148 F. 3d 760 (7th Cir. 1998)................................ 20

<u>Nu-Life Construction Corp. v. Board of Education of the City of New York, et al.</u>, 204 A.D. 2d 106, 611 N.Y.S. 2d 529 (1st Dept. 1994) .................................................................... 16

<u>Pacific Carleton Dev. Co. v. 752 Pacific LLC</u>, 62 AD. 3d 677, 878 N.Y.S. 2d 421 (2nd Dept. 2009) .......................................................................................................................... 16

<u>Pitney Bowes Credit Corporation</u>, 251 F. 3d 386 (2nd Cir. 2001)........................................... 15

<u>Reynolds v. Coleman</u>, 527 N.E. 2d 897, 173 Ill. App. 3d 585 (1988)....................................... 9

<u>Rodgers v. Lenox Hill Hospital</u>, 239 A.D. 2d 140, 657 N.Y.S. 2d 616 (1997)............................ 10

<u>Rubin, Inc., et al. v. Schwartz, M.D., et al.</u>, 191 A.D. 2d 171, 594 N.Y.S. 2d 193 (1st Dept. 1993) ....................................................................................................................... 18, 19

<u>Salaban v. East St. L. & I. Water Co.</u>, 284 Ill. App. 358, 1 N.E. 2d 731 (4th Dist. 1936) ........... 19

<u>Scott v. Beth Israel Medical Center, Inc.</u>, 47 A.D. 3d 541, 850 N.Y.S. 2d 81 (1st Dept. 2008) .. 10

<u>Scudder v. Jack Hall Plumbing & Heating, Inc.</u>, 302 A.D. 2d 848, 756 N.Y.S. 2d 330 (3rd Dept. 2003) ............................................................................................................................. 8

<u>Sundland v. Korfund Co.</u>, 260 A. . 80, 100 N.Y. 115 (1st Dept. 1940) ..................................... 10

<u>Wai Ming Ng v. Connie Tow, et al.</u>, 260 A.D. 2d 574, 688 N.Y.S. 2d 647 (2nd Dept. 1999) .... 19

285094.1

## I.   **PRELIMINARY STATEMENT**

Defendants respectfully submit that the evidence adduced during the trial of this matter demonstrates conclusively that Plaintiff Robert Cappiello ("Plaintiff") was terminated for "cause", as set forth in the Employment Agreement, and that Defendant David Palcek ("Palcek") was at all times herein acting in his capacity as President and Chief Executive Officer of Defendant ICD Publications, Inc. ("ICD") and in the best interests of the company and, therefore, cannot as a matter of law have tortiously interfered with the Employment Agreement executed by Plaintiff and Defendant ICD. Moreover, the evidence adduced during the trial of this matter clearly demonstrates that, should this Court determine that Defendant ICD breached the Employment Agreement by terminating Plaintiff's employment on January 31, 2008, Plaintiff is not as a matter of law entitled to receive commission payments based upon the clear and unambiguous provisions of the Employment Agreement itself. Further, the evidence adduced during the trial of this action demonstrates conclusively that Plaintiff, despite having a duty to mitigate any potential damages suffered as a result of the termination of the Employment Agreement, chose, upon the advice of counsel, not to conduct a trade show that Plaintiff himself advised during direct examination would have generated a substantial profit for himself and other organizers of the event. The evidence adduced at trial further demonstrates that Plaintiff has submitted no evidence, other than his entirely uncorroborated and speculative testimony, that he is entitled to damages for benefits allegedly denied to him, namely health and dental insurance premiums, when he was terminated by ICD. Rather, the evidence adduced during the trial of this action overwhelmingly demonstrates that Plaintiff was terminated for "cause", as defined in the Employment Agreement itself, as a result of his repeated disloyal and dishonest acts towards Defendant ICD.

## II.     FACTUAL BACKGROUND

Defendant ICD is a publishing company in the business of producing magazines in the housewares and hotel industries. On June 11, 2007, Plaintiff and Defendant ICD entered into a duly executed Employment Agreement ("Employment Agreement"). See Plaintiff's Exhibit 8. Prior to the execution of the Employment Agreement, Plaintiff received an offer letter from Ian Gittlitz, then President and Chief Executive Officer of Defendant ICD. The offer letter specifically advised Plaintiff that his job duties at ICD "shall change periodically, and may move between ICD's Hospitality and Retail Groups". See Plaintiff's Exhibit 4. Further, "the scope of" Plaintiff's executive responsibility would "also change between (or be a combination of) publication publishing, trade show management, special summit and roundtable conferences, and advertising space sales". See Plaintiff's Exhibit 4. While Mr. Gittlitz authored the letter, he was **not** called as a witness to testify on Plaintiff's behalf at trial. Accordingly, despite Plaintiff's vehement arguments to the contrary, he was not hired as a Vice President of Defendant ICD to create trade shows for the company. Plaintiff admitted during cross-examination that the words "trade show" do no appear anywhere in the Employment Agreement. See Trial Transcript, p. 265 (hereafter referred to as "TT"). Moreover, Plaintiff admitted during cross-examination he did not have an attorney review the Employment Agreement on his behalf prior to signing it. See TT, p. 265. Most importantly, however, Plaintiff admitted that the Employment Agreement "did not accurately reflect" what he "expected" his "position to be at ICD …". See TT, p. 266. Accordingly, **Plaintiff admitted during trial that while it was his belief that he was being hired by Defendant ICD to create trade shows, the Employment Agreement itself clearly and unambiguously states that he was not, in fact, retained by Defendant ICD to do so.**

Importantly, Defendant Palcek testified at trial that, as a shareholder of Defendant ICD at the time of Plaintiff's hiring, he had the authority to prevent Plaintiff's employment at Defendant ICD. Rather, Defendant Palcek advised that it was his impression at the time of Plaintiff's hiring that

2

Plaintiff's employment at Defendant ICD would give Defendant ICD "bench strength" and that Plaintiff "would be a welcome addition to the company". See TT, p. 722.

The terms of Plaintiff's employment were set forth in Plaintiff's Employment Agreement, which Plaintiff executed on June 11, 2007. The Employment Agreement states that Plaintiff was hired by Defendant ICD to serve as a Vice President, Conferences and Special Events. See Plaintiff's Exhibit 11. Conferences and special events, as set forth in the contract, consisted of industry roundtable discussions and "summits", wherein executives and employees in the housewares and hotel industries would meet to discuss trends and business practices in the industry. See Plaintiff's Exhibit 11. In consideration for the rights and benefits provided to Plaintiff therein, the Employment Agreement required Plaintiff to "devote Employee's best efforts and Employee's full business time and attention (except for permitted vacation periods, leaves of absences, and periods of illness or other incapacity) to the business and affairs of the Company, and Employee shall report to the President". The Employment Agreement further provides that Plaintiff's employment could be terminated "upon written notice by the Company that it is Terminating the Employment Period for Cause". See Plaintiff's Exhibit 11. "Cause", as defined in the Agreement, means "the commission of a felony or a crime involving moral turpitude or the commission of any other act involving dishonesty, disloyalty or fraud with respect to the Company". See Plaintiff's Exhibit 11. The Employment Agreement further provided that Plaintiff was to be paid "a base salary of two hundred and ten thousand dollars ($210,000.00) per annum" between June 11, 2007 and June 1, 2010. See Plaintiff's Exhibit 11.

The Employment Agreement further states as follows:

> Employee shall be entitled to commissions (the "Commissions") **based on performance**, at a schedule to be determined upon the starting date (above). However, it is the intent of the Employer to design a commission program which will reach $60,000.00 annually, **based on performance of the Employee in achieving additional net sales for the Company.**

See Plaintiff's Exhibit 11 (emphasis supplied). Accordingly, the Employment Agreement itself states clearly and unambiguously that Plaintiff's commission package was premised entirely on Plaintiff's, and only Plaintiff's, performance in achieving additional net sales for Defendant ICD. Defendant Palcek stated during trial that Plaintiff's entitlement to commissions was entirely discretionary and based upon Plaintiff's performance. See TT, pp. 830-835. **The evidence adduced during the trial of this action overwhelmingly demonstrates that Plaintiff did not achieve any additional net sales for Defendant ICD during his employment.** Accordingly, pursuant to the clear and unambiguous provisions of the Employment Agreement itself and the testimony of the witnesses, Plaintiff was not entitled to receive any commission payments from Defendant ICD.

On or about July 2, 2007, Ian Gittlitz, the President and Chief Executive Officer of Defendant ICD, was terminated from Defendant ICD for "cause" by the other shareholders of the company, Defendant Palcek and Cynthia Evans. See Plaintiff's Exhibit "21". A lawsuit was initiated against Mr. Gittlitz by Defendant ICD in the state of Illinois alleging that Mr. Gittlitz committed fraudulent acts and breached his fiduciary duty during his tenure as President and Chief Executive Officer of Defendant ICD. See Plaintiff's Exhibit "21". Plaintiff advised during the trial of this action that he is aware of that lawsuit. See TT, at p. 270. Moreover, it is undisputed that Ms. Evans, as a shareholder of Defendant ICD, and not Defendant Palcek, terminated Mr. Gittlitz. See TT, at p. 745. Importantly, Plaintiff initially denied during direct examination that he was present at Defendant ICD's office on July 2, 2007, and was not made aware of Mr. Gittlitz's termination until the following week. However, during cross-examination, Plaintiff admitted that he was in Defendant ICD's office on July 1 and July 2, 2007. See TT, at p. 274. Moreover, contrary to Plaintiff's assertions, Plaintiff was made aware of Mr. Gittlitz's pending termination during this period, and Plaintiff was offered, and accepted, the role of Interim Group Publisher for Defendant ICD's Hospitality Group on July 2, 2007. See TT, pp. 273-274, 744-745,

4

and 664-666. Also, on July 2, 2007, Defendant Palcek assumed the title of Chief Executive Officer and President of Defendant ICD. See Plaintiff's Exhibit "21".

In July, 2007, James Schultz was hired to serve as a Senior Vice-President of ICD assigned to the ICD hotel industry division, also referred to as the Hospitality Group. See Defendant's Exhibit "G"; see TT, p. 396. After Mr. Schultz was hired as a Senior Vice-President of Defendant ICD, Plaintiff reported to Mr. Schultz and Defendant Palcek.  Between July, 2007, and Plaintiff's termination on January 31, 2008, Plaintiff committed several acts evidencing his disloyalty and dishonesty towards Defendant ICD, and it was these acts, when considered in conjunction with Plaintiff's "apathy" in performing his job responsibilities, that resulted in his just termination for "cause" by Defendant ICD, as provided for in the Employment Agreement. See TT, pp. 457, 472, and 475.

It was Defendant ICD's company policy during Plaintiff's employment tenure that employees were permitted to work from a "home" office if said employee resided in a different state than Defendant ICD's corporate offices. Defendant ICD had corporate offices in East Setauket, New York and Lincolnshire, Illinois. See TT, pp. 760-761. From June 11, 2007 until November 21, 2007, Plaintiff spent several work days per month at an alleged "home" office located in Toronto, Canada. However, the "home" office was not Plaintiff's home and is owned by a woman named Michelle Roberts. See TT, pp. 762-763. Plaintiff failed to disclose to anyone at Defendant ICD that this office was not, in fact his home. It was only after Defendant Palcek and Ms. Evans confronted Plaintiff directly about the issue did he reveal that the office was, in fact, the home of a woman named Michelle Roberts. Moreover, Plaintiff was involved in an extramarital affair with Ms. Roberts during this time period. See TT, pp. 761-763. Plaintiff's failure to disclose said information to Defendant ICD constituted an act of dishonesty and disloyalty to Defendant ICD in violation of the Employment Agreement.

285094.1

In November, 2007, Plaintiff was assigned the responsibility to acquire a contact name for HGTV to pursue their participation in the Housewares Design Awards on behalf of Defendant ICD. Plaintiff advised that he would contact a former colleague, Beth Blake, at Reed Publications, to obtain the contact information. See TT, p. 212. On November 29, 2007, Peter Giannetti, a senior executive at Defendant ICD, telephoned Plaintiff to ascertain the status of this assigned task. Plaintiff advised Mr. Giannetti that he did contact Ms. Blake and that Ms. Blake advised him that the person was no longer employed by HGTV. See TT, pp. 672-673. However, Mr. Giannetti spoke directly with Ms. Blake several weeks later via telephone and asked her if Plaintiff had contacted her and requested the name of the contact person for HGTV. Ms. Blake did not respond to Mr. Giannetti's question. It was Mr. Giannetti's impression following his telephone conversation with Ms. Blake that Plaintiff did not, in fact, contact her to obtain the contact information. See Defendants' Exhibit "J".

In July, 2007, Plaintiff was assigned by Mr. Schultz to oversee and maintain the accounts of several ICD advertisers that were previously managed by Richard Casson, an senior sales executive who had resigned from Defendant ICD. See TT, pp. 481-485. Plaintiff, however, failed to even contact these advertisers, let alone service their accounts. As a direct result of Plaintiff's failure to even contact these advertisers, Classic Coffee Concepts, Inc., one of the advertisers whose account Plaintiff was assigned, subsequently terminated its business relationship with Defendant ICD. See Defendants' Exhibit "N".

Further, in July, 2007, Plaintiff was assigned by Mr. Schultz and Defendant Palcek the task of completing the editorial calendars and rate sheets for Defendant ICD's publications for the 2008 fiscal year. In fact, Plaintiff did not complete the editorial calendars and rate sheets for Defendant ICD's publications for the 2008 fiscal year. See TT, pp. 409-414.

In November, 2007, Plaintiff represented Defendant ICD at a hotel industry trade show in New York, New York. Plaintiff did not engage with potential advertisers or customers during the trade show.

6

In fact, Plaintiff remained in the ICD booth during the trade show and only communicated with one potential client, Wyndham, attending the event. See TT, pp. 473-474. Plaintiff's conduct during the hotel industry trade show demonstrated disloyalty towards Defendant ICD to the point where his supervisor, Mr. Schultz, characterized his behavior as being "so wrong" and that Plaintiff was "apathetic towards working the show" and "didn't seem to care" about Defendant ICD. See TT, pp. 473-475.

In August, 2007, Plaintiff was assigned the task of creating a conference for high level executives in the hospitality industry. Plaintiff completely failed to organize the conference. See TT, pp. 430-434. The record **clearly** demonstrates that between July, 2007 and Plaintiff's termination on January 31, 2008, Plaintiff never proposed any new ventures for special events and/or conferences for Defendant ICD.

In December, 2007, Plaintiff had a conversation with William McGloughlin, an editor employed by Defendant ICD. During said conversation, Plaintiff advised Mr. McGloughlin that he had been hired to do trade shows for the company, that his compensation was in some way tied to the performance of these trade shows, that he was  dissatisfied that he was not being permitted to do these trade shows, and that he was not happy with that situation. See TT, pp. 633-666. During the December, 2007 conversation with Mr. McGloughlin, Plaintiff further advised that there were three potential resolutions to his employment status at Defendant ICD. These three potential resolutions were: 1) Plaintiff resigning from Defendant ICD; 2) Defendant ICD purchasing the remainder of his employment agreement; and 3) Plaintiff and ICD engaging in a negotiated settlement or litigation proceeding. See TT, pp. 665-668. Plaintiff additionally advised that "while he can help grow publication revenues in an advertising and sales development role", it was not his preference to do so. See TT, pp. 665-668; see also Defendants' Exhibit "H". Mr. McGloughlin himself opined during trial that Plaintiff, in initiating said conversation, was "attempting to provoke a confrontation" with Defendant ICD. See TT, p. 638. Plaintiff himself

demonstrated that he was aware that his conversation with Mr. McGloughlin, at the very least, constituted a disloyal act with respect to Defendant ICD when he told him, after his employment was terminated, that he "was an asshole". <u>See</u> TT, p. 639-640.

On January 31, 2008, Plaintiff's employment at Defendant ICD was terminated for cause, as defined in Plaintiff's Employment Agreement. Specifically, Defendant ICD terminated Plaintiff's employment based upon his failure to devote his best efforts and full business time and attention to the business and affairs of Defendant ICD and for committing acts involving fraud, dishonesty and disloyalty, as set forth herein, with respect to Defendant ICD.

Plaintiff testified at trial that, despite his best efforts, he was unable to obtain new employment following his termination at Defendant ICD. <u>See</u> TT, pp. 229-235. However, Plaintiff admitted during cross-examination that it was his intention to launch the First Look Housewares Show in partnership with Ian Gittlitz in January, 2009. Plaintiff advised during trial that the First Look Housewares Show would be profitable, making "$200,000 in the first year and would make about $2 million profit in the fourth year". <u>See</u> TT, pp. 84-85. However, Plaintiff testified that upon the advice of counsel, and only the advice of counsel, he "decided not to". <u>See</u> TT, p. 286. Plaintiff's failure to launch what he described as a profitable business venture "upon the advice of counsel" overwhelmingly demonstrates that he did not mitigate his alleged damages in this action.

### III.   <u>ARGUMENT</u>

Where, as here, the parties to an employment agreement "set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms". <u>Scudder v. Jack Hall Plumbing & Heating, Inc.</u>, 302 A.D. 2d 848, 756 N.Y.S. 2d 330 (3rd Dept. 2003). Moreover, the Agreement provides that "[A]ll questions with respect to the construction of this Agreement and the rights and liabilities of the parties hereto shall be determined in accordance with the laws of the State of

285094.1

Illinois, without reference to its conflicting laws provisions". <u>See</u> Plaintiff's Exhibit "21". Illinois law

mandates that where "the terms in an agreement are clear and unambiguous, they will be given their

ordinary and natural meaning". <u>See</u> <u>Reynolds v. Coleman</u>, 527 N.E. 2d 897, 173 Ill. App. 3d 585 (1988).

Moreover, the "entire agreement should be considered" and a "construction which is contrary to the

plain meaning of the words should be avoided". <u>Harrison v. Sears, Roebuck & Company, et al.</u>, 546

N.E. 2d 248, 189 Ill. App. 3d 980 (4th Dist. 1989); <u>see also</u> <u>Johnstowne Centre Partnership v. Chin</u>, 458

N.E. 2d 480, 99 Ill. 2d 284 (1983). As set forth herein, the Employment Agreement required Plaintiff to

"devote Employee's best efforts and Employee's full business time and attention (except for permitted

vacation periods, leaves of absences, and periods of illness or other incapacity) to the business and

affairs of the Company". <u>See</u> Plaintiff's Exhibit "21". Moreover, the Employment Agreement further

provides that the Plaintiff's employment could be terminated "upon written notice by the Company that

it is Terminating the Employment Period for Cause". <u>See</u> Plaintiff's Exhibit "21". "Cause", as defined in

the Agreement, means "the commission of a felony or a crime involving moral turpitude or the

commission of any other act involving dishonesty, disloyalty or fraud with respect to the Company". <u>See</u>

Plaintiff's Exhibit "21". Accordingly, pursuant to the unambiguous terms of the Employment

Agreement, Defendants respectfully submit that the Employment Agreement should be interpreted in

accordance with the laws of Illinois and that the evidence adduced at trial overwhelmingly demonstrates

that Plaintiff committed numerous acts involving dishonesty, disloyalty and fraud, warranting his

termination for "Cause", as defined therein.

### PLAINTIFF COMMITTED NUMEROUS FRAUDULENT, DISHONEST, AND DISLOYAL ACTS WARRANTING HIS TERMINATION FROM DEFENDANT ICD FOR "CAUSE", AS DEFINED IN THE EMPLOYMENT AGREEMENT

It is a well established principal that, with reference to employment contracts, "there is an

implied condition that the servant will perform the duties incident to his employment honestly, and will

9

285094.1

do nothing injurious to his employer's interest, and if he proves radically unfaithful to his trust or is guilty of gross misconduct he forfeits all rights to compensation". <u>Boock v. Napier, et al.</u>, 120 N.E. 2d 244, 3 Ill. app. 2d 19 (1st District 1954). While not controlling, New York Courts have routinely determined that an employer, in "defending a wrongful discharge action, need only produce evidence showing some basis for dissatisfaction with the employee's work". <u>Golden, et al. v. Worldvision Enterprises, Inc.</u>, 133 A.D. 2d 50, 519 N.Y.S. 2d 1 (1st Dept. 1987); <u>see</u> <u>also</u> <u>Scott v. Beth Israel Medical Center, Inc.</u>, 47 A.D. 3d 541, 850 N.Y.S. 2d 81 (1st Dept. 2008).

As a matter of common law, dishonest and disloyal conduct warranting the termination of an employment agreement constitutes "misconduct and unfaithfulness which substantially violate the contract of service". <u>Rodgers v. Lenox Hill Hospital</u>, 239 A.D. 2d 140, 657 N.Y.S. 2d 616 (1997); <u>see also</u> <u>Sundland v. Korfund Co.</u>, 260 A. . 80, 100 N.Y. 115 (1st Dept. 1940). Here, the Employment Agreement itself provides that Plaintiff was obligated "to devote Employee's best efforts and Employee's full business time and attention (except for permitted vacation periods, leaves of absences, and periods of illness or other incapacity) to the business and affairs of the Company". <u>See</u> Plaintiff's Exhibit "21". Defendants respectfully assert that here, the evidence adduced at trial clearly demonstrates that Plaintiff repeatedly failed to perform assigned tasks, lied to his superiors about completing assigned tasks, and committed additional acts involving dishonesty and disloyalty to Defendant ICD (including expressing his desire to leave the company and not utilize his "best efforts" during his employment with the company), which as a matter of law violated "the contract of service". <u>Rodgers</u>, <u>supra</u>. Accordingly, the Employment Agreement was justifiably terminated for cause, as defined therein.

285094.1

I.      **Plaintiff's failure to advise Defendant ICD that his "home" office was not , in fact, Plaintiff's residence constituted a fraudulent, dishonest and disloyal act warranting the termination of the Employment Agreement.**

Pursuant to Illinois law, fraud is defined as "anything intended to deceive, including all acts, omissions and concealments involving a breach of legal or equitable duty, trust or confidence resulting in damage" to the other contracting party. Carey Electric Contracting, Inc. v. First National Bank of Elgin, 392 N.E. 2d 759, 74 Ill. App. 3d 233 (1979). Moreover, fraud "may also be inferred from the relationship of the parties and the surrounding circumstances regardless of any actual dishonesty of purpose". Id. It requires neither "actually dishonesty nor intent to deceive, being a breach of legal or equitable duty which, irrespective of the moral guilt of the wrongdoer, the law declares fraudulent because of its tendency to deceive others". Id., see also In Re: Estate of Neprozatis, 378 N.E. 2d 1345, 62 Ill. app. 3d 563 (1978).

During trial, Plaintiff admitted that the "home" office from which he was to work several days a month during the course of his employment was not, in fact, Plaintiff's home. Plaintiff failed to advise anyone at Defendant ICD that his "home" office was not, in fact, Plaintiff's residence until he was confronted directly about the issue at a meeting with Defendant Palcek and Cynthia Evans in September, 2007, nearly four (4) months after the Employment Agreement was executed. See TT, pp. 762-763. In fact, Defendant Palcek concluded as a direct result of learning that Plaintiff's "home" office was not, in fact, Plaintiff's home that allowing Plaintiff to continue working from the off site location was not in the "best interests of Defendant ICD". See Defendants' Exhibit "D". Moreover, Defendant Palcek's and Mr. Schultz's trial testimony conclusively establish that Plaintiff's working from his alleged "home" office was detrimental to the operations of Defendant ICD in that Plaintiff was not available to communicate promptly and effectively with other ICD employees when he was not in the office. See TT, pp. 451-456, 768-773. Accordingly, Plaintiff's failure to disclose to Defendant ICD that his alleged "home" office

was not, in fact, Plaintiff's residence, in direct violation of Defendant ICD's company policies as testified to by Defendant Palcek during trial, constitutes a disloyal, dishonest, and fraudulent act that warranted his termination from Defendant ICD for cause, as set forth in the Employment Agreement. See Boock, supra; see also Golden, supra.

  **II.**  **Plaintiff's failure to acquire a contact name for HGTV from a former colleague at Reed Publications to pursue their participation in the Housewares Design Awards and his representation to Defendant ICD that he did, in fact, do so constituted acts of disloyalty and dishonesty warranting the termination of the Employment Agreement.**

In November, 2007, Plaintiff advised that he would contact a former colleague, Beth Blake, at Reed Publications, to obtain the contact information. See TT, p. 212. On November 29, 2007, Peter Giannetti, a senior executive at Defendant ICD, telephoned Plaintiff to ascertain the status of this assigned task. Plaintiff advised Mr. Giannetti that he did contact Ms. Blake and that Ms. Blake advised him that the person was no longer employed by HGTV. See TT, pp. 672-673. However, Mr. Giannetti spoke directly with Ms. Blake several weeks later via telephone and asked her of Plaintiff had contact her and requested the name of the contact person for HGTV. Ms. Blake did not respond to Mr. Giannetti's question. It was Mr. Giannetti's impression following his telephone conversation with Ms. Blake that Plaintiff did not, in fact, contact her to obtain the contact information. See Defendants' Exhibit "J". Plaintiff's failure to contact Ms. Blake, and his representation to Mr. Gianetti that he did so, constituted an act of dishonesty and disloyalty warranting the termination of the Employment Agreement. See Boock, supra; see also Golden, supra.

  **III.**  **Plaintiff's failure to oversee and maintain the accounts of several ICD advertisers, resulting in the loss of at least one account, constituted an act of disloyalty and dishonesty warranting the termination of the Employment Agreement.**

In July, 2007, Plaintiff was assigned by Mr. Schultz to oversee and maintain the accounts of several ICD advertisers that were previously managed by Richard Casson, a senior sales executive who

had resigned from Defendant ICD. See TT, pp. 481-485. Plaintiff, however, failed to even contact these advertisers, let alone service their accounts. As a direct result of Plaintiff's failure to even contact these advertisers, Classic Coffee Concepts, Inc., one of the advertisers whose account Plaintiff was assigned, subsequently terminated its business relationship with Defendant ICD. See Defendants' Exhibit "N".

Plaintiff's failure to oversee these accounts, let alone communicate at all with the advertisers themselves, constituted an act of disloyalty to Defendant ICD that warranted the termination of the Employment Agreement. See Boock, supra; see also Golden, supra.

IV.   **Plaintiff's failure to complete the editorial calendars and rate sheets for ICD's publications for the 2008 fiscal year constituted an act of disloyalty and dishonesty warranting the termination of the Employment Agreement.**

Further, in July, 2007, Plaintiff was assigned by Mr. Schultz and Defendant Palcek the task of completing the editorial calendars and rate sheets for Defendant ICD's publications for the 2008 fiscal year. In fact, Plaintiff did not complete the editorial calendars and rate sheets for Defendant ICD's publications for the 2008 fiscal year. See TT, pp. 409-414. Plaintiff's failure to complete the assigned task constituted an act of disloyalty to Defendant ICD that warranted the termination of the Employment Agreement. See Boock, supra; see also Golden, supra.

V.   **Plaintiff's failure to represent ICD at a hotel industry trade show in New York, New York by engaging with potential advertisers or customers during the trade show constituted an act of disloyalty and dishonesty warranting the termination of the Employment Agreement.**

In November, 2007, Plaintiff represented Defendant ICD at a hotel industry trade show in New York, New York. Plaintiff did not engage with potential advertisers or customers during the trade show. In fact, Plaintiff remained in the ICD booth during the trade show and did not communicate with non-ICD employees attending the event. See TT, pp. 473-475. Plaintiff's complete failure to represent the

13

interests of Defendant ICD at the trade show constituted an act of disloyalty that warranted the termination of the Employment Agreement. See Boock, supra; see also Golden, supra.

**VI.     Plaintiff's failure to create a conference for high level executives in the hospitality industry when instructed to do so constituted an act of disloyalty dishonesty warranting the termination of the Employment Agreement.**

In August, 2007, Plaintiff was assigned the task of creating a conference for high level executives in the hospitality industry. Plaintiff completely failed to organize the conference. See TT, pp. 430-434. The record clearly demonstrates that between July, 2007 and Plaintiff's termination on January 31, 2008, Plaintiff never proposed any new ventures for special events and/or conferences for Defendant ICD. Plaintiff's complete failure to complete this assigned task, together with his failure to propose any new, additional ventures for special events/conferences for Defendant ICD, constituted acts of disloyalty warranting the termination of the Employment Agreement. See Boock, supra; see also Golden, supra.

**VII.    Plaintiff's conversation with William McGloughlin in December, 2007, wherein he advised another ICD employee that it was not his intention to utilize best efforts on behalf of Defendant ICD business, constituted an act of dishonesty and disloyalty warranting the termination of the Employment Agreement.**

In December, 2007, Plaintiff had a conversation with William McGloughlin, an editor employed by Defendant ICD. During said conversation, Plaintiff advised Mr. McGloughlin that he had been hired to do trade shows for the company, that his compensation was in some way tied to the performance of these trade shows, that he was  dissatisfied that he was not being permitted to do these trade shows, and that he was not happy with that situation. See TT, pp. 633-666. During the December, 2007 conversation with Mr. McGloughlin, Plaintiff further advised that there were three potential resolutions to his employment status at Defendant ICD. These three potential resolution were: 1) Plaintiff resigning from Defendant ICD; 2) Defendant ICD purchasing the remainder of his employment agreement; and 3) Plaintiff and ICD engaging in a negotiated settlement or litigation proceeding. See TT, pp. 665-668.

14

Plaintiff additionally advised that "while he can help grow publication revenues in an advertising and sales development role", it was not his preference to do so. See TT, pp. 665-668; see also Defendants' Exhibit "H". Mr. McGloughlin himself opined during trial that Plaintiff, in initiating said conversation, was "attempting to provoke a confrontation" with Defendant ICD. See TT, p. 638. Plaintiff himself demonstrated that he was aware that his conversation with Mr. McGloughlin, at the very least, constituted a disloyal act with respect to Defendant ICD when he told him, after his employment was terminated, that he "was an asshole". See TT, p. 639-640. Accordingly, Plaintiff's conversation with Mr. McGlaughlin confirmed that he was engaging in acts of dishonesty and disloyalty against Defendant ICD, thus warranting the termination of the Employment Agreement. See Boock, supra; see also Golden, supra.

### DEFENDANT PALCEK WAS AT ALL TIMES ACTING WITHIN THE SCOPE OF HIS DUTIES AS PRESIDENT AND CHIEF EXECUTIVE OFFICER OF DEFENDANT ICD AND CANNOT, AS A MATTER OF LAW, BE DEEMED TO HAVE TORTIOUSLY INTERFERED WITH THE EMPLOYMENT AGREEMENT

Defendants respectfully assert that while the interpretation of the Employment Agreement itself is governed by Illinois law, Plaintiff's second cause of action against Defendant Palcek for tortious interference with the Employment Agreement is governed by tort law, not contract law, and, therefore, is governed by New York law. See Lazard Freres & Co. v. Protective Life Ins. Co., 108 F. 3d 1531, 1539-41 (2d Cir. 1997). Defendants further assert that there is no conflict in applying Illinois law to the breach of contract claim and New York law to the tortious interference claim asserted by the Plaintiff. Under the doctrine of depecage as applied by New York courts, "the rules of one legal system are applied to regulate certain issues arising from a given transaction or occurrence, while those of another system regulate other issues". Hunter v. Greene, 734 F. 2d 896, 901 (2d Cir. 1984); see also Fieger v. Pitney Bowes Credit Corporation, 251 F. 3d 386 (2nd Cir. 2001). A review of New York law conclusively demonstrates that Plaintiff cannot sustain a cause of action for tortious interference with the

285094.1

Employment Agreement against Defendant Palcek in that at all times Defendant Palcek was acting in his capacity as President and Chief Executive Officer of Defendant ICD and, therefore, was acting on behalf of Defendant ICD and in the best interests of the company.

It is well settled law in New York that to sustain a cause of action for tortious interference with an employment contract, a plaintiff must demonstrate that there was (1) a valid contract between plaintiff and a third party; (2) defendant knew of the contract; (3) defendant intentionally induced breach or rendered performance impossible; and (4) damages to the plaintiff resulting therefrom. See Pacific Carleton Dev. Co. v. 752 Pacific LLC, 62 AD. 3d 677, 878 N.Y.S. 2d 421 (2nd Dept. 2009); see also Miller v. Ojima, 354 F. Supp. 2d 220 (E.D.N.Y. 2005). In addition, a plaintiff must demonstrate that the individual defendant was not "acting on behalf of the corporate defendant" and "within the scope of their authority". Marks v. Smith, et al., 65 A.D. 3d 911, 885 N.Y.S. 2d 463 (1st Dept. 2009); see also Nu-Life Construction Corp. v. Board of Education of the City of New York, et al., 204 A.D. 2d 106, 611 N.Y.S. 2d 529 (1st Dept. 1994). As set forth herein, Defendants in no manner breached the Employment Agreement when Plaintiff was terminated for "cause" as defined therein. Moreover, it undisputed in this action that Defendant Palcek was the President and Chief Executive Officer of Defendant ICD at the time Plaintiff's Employment Agreement was terminated and, accordingly, was acting within the "Scope of their [his] authority" when the Employment Agreement was terminated. Marks, supra.

The record in this action is completely devoid of any evidence to support Plaintiff's allegation that Defendant Palcek interfered with Plaintiff's performance of his duties. Marks, supra. Plaintiff was offered, and he accepted, the role of Interim Group Publisher for Defendant ICD's Hospitality Group. See TT, pp. 273-274, 744-745, and 664-666. During the June, 2007 meeting with Plaintiff, Mr. Gittlitz, and Ms. Evans, Defendant Palcek supported Plaintiff's proposal to create a C-Level summit, yet, together with Ms. Evans, felt that the event should be held in 2009, not 2008. See TT, at pp. 734-736.

16

Plaintiff argues that Defendant Palcek was intent on terminating all ICD employees loyal to Mr. Gittlitz or "part of Ian's Game". See Plaintiff's Post-Trial Memorandum of Law, at p. 7. However, a review of the trial testimony indicates that 31 of ICD's 34 employees at the time of Mr. Gittlitz's termination were, in fact, hired by Mr. Gittlitz, and Mr. Palcek had no intention of terminating any of them. See TT, pp. 718-721. Plaintiff further contends that Defendant Palcek interfered with Plaintiff's ability to create trade shows for Defendant ICD. As demonstrated conclusively at trial, Plaintiff was not hired by Defendant ICD to create trade shows. Moreover, the evidence adduced at trial clearly demonstrates that between July 1, 2007 and Plaintiff's termination on January 31, 2008, Plaintiff did not at any time propose any trade show, special events, and/or conferences to Defendant Palcek. The only trade show that Plaintiff claims Defendant Palcek prevented him from doing, the trade show that Plaintiff proposed in June, 2007, was determined not to be in Defendant ICD's best interests by Defendant Palcek and Ms. Evans for legitimate business reasons. See TT, pp. 732-735. In fact, the only ICD employee who believed that Plaintiff was hired by Defendant ICD to create trade shows was, in fact, Plaintiff himself. See TT, pp. 783, 636, and 696. Plaintiff was offered, and accepted, the role of Interim Group Publisher for Defendant ICD. See TT, pp. 273-274, 744-745, and 664-666. Defendant Palcek made the decision to terminate Plaintiff's Employment Contract together with Ms. Evans, the other shareholder of Defendant ICD. See TT, pp. 794-795. As a matter of law, Defendant Palcek's decision to terminate Plaintiff's Employment Agreement does not, in and of itself, constitute tortious interference with an employment agreement. Marks, supra. Moreover, the evidence overwhelmingly demonstrates that Defendant Palcek believed that he was acting in the best interests of Defendant ICD when the Employment Agreement was terminated. See TT, pp. 805-806. For the reasons set forth herein, Plaintiff's failure to perform his duties and obligations pursuant to the Employment Agreement constituted acts of disloyalty and

285094.1

dishonesty that warranted the termination of the Employment Agreement for "cause", as defined therein. Accordingly, Plaintiff's cause of action for tortious interference is entirely without merit.

## PLAINTIFF HAS FAILED TO MITIGATE HIS DAMAGES IN THIS ACTION

Plaintiff testified at trial that, despite his best efforts, he was unable to obtain new employment following his termination at Defendant ICD. See TT, pp. 229-235. However, Plaintiff admitted during cross-examination that it was his intention to launch the First Look Housewares Show in partnership with Ian Gittlitz in January, 2009. Plaintiff advised during trial that the First Look Housewares Show would be profitable, making "$200,000 in the first year and would make about $2 million profit in the fourth year". See TT, pp. 84-85, 732. However, Plaintiff testified that upon the advice of counsel, and for no other reason, he "decided not to". See TT, p. 286. Plaintiff's failure to launch what he described as a profitable business venture overwhelmingly demonstrates that he did not mitigate his alleged damages in this action.

Pursuant to New York law, where there is a breach of contract for full-time personal services, "[t]he actual damage is measured by the wage that would be payable during the remainder of the term reduced by the income which the discharged employee has earned, will earn, or could with reasonable diligence earn during the unexpired term". Rubin, Inc., et al. v. Schwartz, M.D., et al., 191 A.D. 2d 171, 594 N.Y.S. 2d 193 (1st Dept. 1993); see also Cornell v. T.V. Development Corp., et al., 215 N.E. 2d 349, 268 N.Y.S. 2d 29 (1966). Plaintiff's own testimony at trial demonstrates that the First Look Housewares Show, which he planned to launch in January, 2009, would have made "$200,000 in the first year and would make about $2 million profit in the fourth year". See TT, pp. 84-85, 732. If Plaintiff chose to launch the trade show, than Plaintiff's entire claim for compensatory damages would have been extinguished. Plaintiff could have chosen to mitigate his damages and hold the First Look Housewares Show. Plaintiff testified, however, that upon the advice of counsel, he chose not to.

Plaintiff's own testimony demonstrates that his damages would have been mitigated by in excess of $200,000 had he gone ahead with the First Look Housewares Show. Accordingly, as a matter of law, Plaintiff failed to mitigate his damages when he could, with reasonable diligence, have launched the First Look Housewares Show in January, 2009, yet chose not to. Rubin, Inc., supra.

## PLAINTIFF HAS FAILED TO SUBMIT ANY CORROBORATING EVIDENCE THAT HE IS ENTITLED TO DAMAGES FOR HEALTH INSURANCE PREMIUMS

Plaintiff submits that he is entitled to $39,425.33 for medical insurance premiums between February 1, 2008 until June 1, 2010 and $3,545.59 for dental insurance premiums paid between February 1, 2008 and June 1, 2010. See Plaintiff's Post-Trial Memorandum of Law, at p. 22. However, Plaintiff has presented no evidence, other than his uncorroborated testimony, that he is entitled to these damages. As a matter of law, Plaintiff's claims for these damages are entirely speculative and should not be awarded. See Abra Construction Corp., v. 112 Duane Associates, LLC, 59 A.D. 3d 263, 873 N.Y.S. 2d 574 (1st Dept. 2009); see also Wai Ming Ng v. Connie Tow, et al., 260 A.D. 2d 574, 688 N.Y.S. 2d 647 (2nd Dept. 1999); see also Bimba Mfg. Co. v. Starz Cylander Co., et al., 256 N.E. 2d 357, 119 Ill. App. 2d 251 (1st Dist. 1970); see also Central Illinois Light Co. v. Stenzel, 195 N.E. 2d 207, 44 Ill. App. 2d 388 (3d Dist. 1963); see also Salaban v. East St. L. & I. Water Co., 284 Ill. App. 358, 1 N.E. 2d 731 (4th Dist. 1936).

## SHOULD THE COURT DETERMINE THAT DEFENDANT ICD BREACHED THE EMPLOYMENT AGREEMENT, PLAINTIFF IS NOT ENTITLED TO RECEIVE INTEREST FOR ANY COMPENSATORY DAMAGES INCURRED BETWEEN JANUARY 31, 2008 AND THE PRESENT

Should the Court determine that Defendant ICD did breach the Employment Agreement with Plaintiff when the Employment Agreement was terminated, Defendants respectfully submit that, as a matter of law, Plaintiff is not entitled to receive interest for compensatory damages from the date of the breach, January 31, 2008, until the present. It is undisputed that the Employment Agreement at issue in

285094.1

this action is governed by Illinois Law. See Plaintiff's Post Trial Memorandum of Law, at p. 14. Accordingly, Defendants respectfully submit that the award of interest for any compensatory damages resulting from any breach is also governed by Illinois Law. See Haslund v. Simon Proprty Group, Inc., 378 F. 3d 653 (7th Cir. 2004).

Courts have routinely determined that making an award of prejudgment interest is a matter within the trial judge's discretion under Illinois law. Dallis v. Don Cunningham and Associates, 11 F. 3d 713 (Ill. 1993); see also Movitz v. First National Bank of Chicago, 148 F. 3d 760 (7th Cir. 1998). Further, pursuant to Illinois law, prejudgment interest may be awarded only "when warranted by equitable considerations" and may disallow it "where it would not comport with justice and equity". Hooker, et al. v. The Retirement Board of the Firemen's Annuity and Benefit Fund of Chicago, 907 N.E. 2d 447, 329 Ill. App. 3d 129 (First Dist. 2009). The evidence presented during the trial of this action demonstrates conclusively that Plaintiff failed to perform his duties as a Vice President of Defendant ICD. In fact, the evidence is clear that upon learning that the Employment Agreement was terminated, Plaintiff was not in the least bit agitated or surprised. See TT, pp. 803-805. Rather, Plaintiff was visibly upset only when he was advised of the amount of the severance pay Defendants were offering. See TT, p. 805.

Illinois law provides as follows:

> [C]reditors shall be allowed to receive interest at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance; on money received to the use of another and retained without the owner's knowledge; and on money withheld by an unreasonable and vexatious delay of payment. In the absence of an agreement between the creditor and debtor governing interest charges, upon 30 days' written notice to the debtor, an assignee or agent of the creditor may charge and collect interest as provided in this Section on behalf of a creditor.

285094.1

815 Illinois Compiled Statutes Annotated 205 § 2. The Employment Agreement itself is silent as to an award of interest in the event of breach by the other party. Accordingly, should the court determine that Plaintiff is entitled to interest, pursuant to Illinois Law, then interest in this matter is capped at five percent per annum.

Accordingly, for the reasons set forth at trial and herein, Defendants respectfully submit that Plaintiff is not entitled to prejudgment interest should the Court determine that Defendant ICD breached the Employment Agreement when Plaintiff's employment was terminated.

285094.1

## CONCLUSION

In light of the foregoing, Defendants respectfully request that Plaintiff's request for compensatory damages totaling $712,587.06 plus court costs and statutory interest from January 31, 2008 be denied in that Defendant ICD did not breach the Employment Agreement when Plaintiff was terminated for "cause", as defined therein. Defendants further request Plaintiff's request for damages, including punitive and/or exemplary damages, as a result of Defendant Palcek's alleged tortious interference with the Employment Agreement be denied in that Defendant Palcek did not in any manner tortiously interfere with the Employment Agreement executed by Defendant ICD and Plaintiff.

Rather, Defendants respectfully submit that this Court should grant judgment in favor of Defendants and against Plaintiff as a matter of law, together with such other, further, and different relief as this Court deems just and proper.

Dated: New York, New York
       April 19, 2010

                             CLAUSEN MILLER P.C.

                    By:   /s/ Edward M. Tobin
                             Edward M. Tobin, Esq. (EMT6592)
                             *Attorneys for Defendants*
                             *ICD PUBLICATIONS, INC.*
                             *and DAVID PALCEK*
                             Phone: (212) 805-3500
                             Facsímile: (212) 805-3939

TO:   Robert N. Cohen, Esq.
       Weinstein, Kaplan & Cohen, P.C.
       Attorneys for Plaintiff
       1325 Franklin Avenue
       Suite 210
       Garden City, NY 11530
       (516) 877-2525

285094.1