UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ROBERT N. CAPPIELLO,

Plaintiff,

- against -

ICD PUBLICATIONS, INC. and  DAVID
PALCEK,

Defendants.
-----------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**
CV 08-02417 (ADS)

**A P P E A R A N C E S:**

**WEINSTEIN, KAPLAN & COHEN, P.C.**
        Attorneys for Plaintiff
        1325 Franklin Avenue, Suite 210
        Garden City, NY 11530
BY:    Danielé D. DeVoe, Esq.,
        of Counsel

**CLAUSEN MILLER P.C.**
        Attorneys for Defendants
        One Chase Manhattan Plaza, 30th Floor
        New York, NY 10005
BY:    Edward M. Tobin, Esq.,
        of Counsel

**SPATT, District Judge.**

The plaintiff Robert N. Cappiello ("the plaintiff" or "Cappiello") has brought this action

for: (1) breach of an Employment Agreement against the defendant ICD Publications, Inc.

("ICD") and, (2) tortious interference with a contract against the defendant David Palcek.  The

plaintiff seeks compensatory and punitive damages and attorneys' fees.

The plaintiff contends that this case is more serious than a breach of contract action and

1

has elements of wrongful, wilful and malicious conduct on the part of the defendants. After hearing the testimony and the presentation of the evidence, the Court disagrees. This is a case involving solely an alleged breach of an employment agreement, as will be clear from the evidence adduced at the trial and set forth in this decision.

## I. BACKGROUND

This civil action is in the Federal Court as it arises from a controversy between citizens of different states, and the amount in controversy exceeds $75,000, exclusive of costs and interest. See 28 U.S.C. § 1332(A). Here, the plaintiff is a citizen of New York residing in Wantagh, New York, and the defendant ICD was and is an Illinois corporation with a principal place of business in Setauket, New York. The defendant David Palcek ("Palcek") is a resident of the State of Illinois. Palcek was and still is the President and Chief Executive Officer of ICD.

The plaintiff, now 52 years of age, had a career in trade shows prior to entering into this agreement with ICD. On June 11, 2007, the plaintiff signed an Employment Agreement with ICD, which is the major subject matter of this lawsuit. In essence, the plaintiff contends that he was terminated on January 31, 2008 without cause and that the defendant ICD is responsible for damages for breach of contract. He also alleges that the defendant Palcek is liable for tortious interference with the contract.

In opposition, the defendant ICD denies that it breached the Employment Agreement and, contends that the plaintiff was discharged for cause, namely, acts of dishonesty and disloyalty. In addition, the defendant Palcek denies that he is liable for tortious interference with the Employment Agreement.

## II. THE EMPLOYMENT AGREEMENT

On June 11, 2007, the plaintiff Robert Cappiello entered into a written employment agreement with ICD Publications, Inc. ("The Agreement"). The term of The Agreement was slightly less than three years, commencing on June 11, 2007 and terminating on June 1, 2010 (the "Expiration Date"). The plaintiff's position, by the terms of The Agreement, was "Vice President, Conferences and Special Event." As to his position and duties, the agreement provided:

> During the Employment Period, Employee shall serve as Vice President, Conference and Special Events, and shall render such sales, marketing, and other services to the company as to the Company's President may from time to time direct. Employee shall devote Employee's best efforts and Employee's full business time and attention (except for permitted vacation periods, leaves of absences, and periods of illness or other incapacity) to the business and affairs of the company, and Employee shall report to the President.

The plaintiff's compensation, as set forth in The Agreement was a salary of $210,000 per year. As to commissions, the Agreement provided:

> Employee shall be entitled to commissions (the "Commissions") based on performance, at a schedule to be determined upon the starting date (above). However, it is the intent of the Employer to design a commission program which will reach $60,000 annually, based on performance of the Employee in achieving additional net sales for the Company.

In addition, the Agreement provided for health insurance and disability insurance, as follows:

> In addition to the salary and commissions payable to Employee, Employer shall be entitled to the following benefits.
>
> Health insurance and disability insurance as outlined in the ICD

Employee Handbook. Insurance is subject to employee
contributions and to starting dates as per Company policy. Also
outlined in the ICD Employee Handbook are benefits including,
but not limited to, sick days, personal days, vacation days, etc.
The first 90 days of employment shall be considered probationary,
with no health insurance provided in the initial 90 days.

Crucial to the decision in this case, is the termination for cause provisions. The

Agreement provides that the employment period shall terminate prior to the date set forth in The

Agreement, "upon written notice by the Company that it is terminating the Employment Period

for Cause." In the Definition portion of The Agreement, "Cause" is defined, as follows:

Definitions.

"Cause" means the commission of a felony or a crime
involving moral turpitude or the commission of any other act
involving dishonesty, disloyalty or fraud with respect to the
Company.

Whether there was "Cause" to terminate the plaintiff on January 31, 2008 because of his

"dishonesty" and/or "disloyalty" is the material issue in this case.

## III. THE TRIAL

### A. The Plaintiff's Case

The plaintiff Robert Cappiello is 52 years of age. He is married and has three children

and has two homes, in Wantagh, Long Island, and a bed and breakfast in North Conway, New

Hampshire. He is a graduate of Hofstra University. He previously worked for publishing

companies. His last employer, prior to ICD, was Reed Elsevier Co., the largest trade show

producer in the world. Cappiello explained that the purpose of a trade show is "to get a group of

like manufacturers together with their customers who can see new product and in many cases

buy that product." (Tr. at 35)[*].  Cappiello worked at Reed Elsevier for almost five years and resurrected their hardware show.  While there, he increased their profit by 247 percent, won awards in the trade show industry, and had articles published about him.

In March 2007, Cappiello was approached by Ian Gittlitz, who was then the President and CEO of ICD, about coming to work for ICD and to start a trade show and conference division for their company.  According to the plaintiff, he left Reed Elsevier to work for ICD to launch a trade show division.

In April 2007, Cappiello received a "Preliminary Proposal Sheet" (Pltf's Ex. 4), which stated, among other things, that his title would be "ICD Vice President, Conferences and Trade Shows;" his compensation shall be a $210,000 base salary, with customary benefits, and, in addition, a performance-based commission designed to reach $60,000 in the first full year of employment; his responsibilities shall be changed periodically and may change between ICD's Hospitality and Retail publishing groups; and he would be responsible for a new Trade Show and Conference Division.

As stated above, The Employment Agreement at issue was signed on June 11, 2007.  The essential terms have been previously described.  In particular, and material to the issues in this case, cause for termination is defined, in part as "the commission of any other act involving dishonesty, disloyalty, or fraud with respect to the company."  ICD printed articles about the plaintiff's hiring.  The plaintiff started working at ICD on June 11, 2007, the date The Agreement was signed.  He worked on various projects.  Shortly thereafter, in late June 2007, Ian Gittlitz was terminated, allegedly for stealing money from the company.  David Palcek was

[*] Tr. refers to the trial transcript.

to be the President of the Company and Cappiello was to be the Interim Group Publisher of the hotel magazines.

Following the termination of Gittlitz, as Interim Publisher, Cappiello coordinated some events of the roundtable think tank, which is a small event. When he was asked who he was loyal to, the plaintiff responded "to ICD." Jay Schultz, who was formerly the Publisher of the Hotel Business Magazine, returned to work for ICD, and became the person in charge of the group of magazine conferences. After Schultz returned to the company, Cappiello did "a little of this and a little of that," including making hotel reservations, ordering coffee and several months of ad hoc tasks. He and another man also designed a customer relationship management system. He also planned a party in Miami Beach for Cindy Evans, among many other tasks. Cindy Evans was the Vice President of ICD and a stockholder. Cindy Evans' proper name is apparently Cynthia Evans.

In August 2007, Schultz asked Cappiello to write the 2008 Editorial Calendar. Within a week or two, he submitted several versions of the Editorial Calendar to Schultz, who never gave him any feedback. As time went on, the plaintiff did other work on the Editorial Calendars, including creating a "sales sheet" (Pltf's Ex. 34). He also worked on a "mission statement" for magazines and the Green Book, which is an annual directory of services and providers for the hotel hospitality industry produced by ICD. Cappiello testified at length with regard to some of the other work he did at ICD. This included a C-Level (High Level) summit; sales calls to Starwood Properties, with the exchanges of e-mails and phone calls; a sales sheet for Electronic Marketing; a presentation to the Wyndham Hotel; negotiations with John Harnack of Hunter Douglas with regard to digital advertising, including a proposal for Harnack by the end of

January 2008; and a Roundtable presentation.

In addition, in November 2007, Cappiello was in charge of a trade show in New York City in the Javits Convention Center involving the hotel/motel business, including being in charge of physically setting up the ICD booth. He made sure the booth was manned and spent a lot of time in the booth. This was to be a problem for him in later times. On December 14, 2007, the plaintiff had a meeting with Palcek and Cindy Evans who advised him that he was spending too much time in the booth and not engaged enough with the customers. In that meeting, the plaintiff raised the subject of the lack of his defined role with the company; his concern that he was not doing trade shows - the reason he came to the company; and his future with the company. He realized that he had to earn substantial money in order to justify his salary and that it might not be economically feasible for him to continue with the company after his employment term expired. Cappiello told Palcek and Evans that while he needed a clearer defined role, he intended to fulfill his contract with ICD.

On January 31, 2008 at about 4 pm at the conference room at ICD headquarters in East Setauket, Cappiello was fired. Present at this meeting was Palcek, Schultz and Peter Giannetti. Palcek told him that he felt he had not been honest with him about contacting one Beth Blake, a former co-worker with the plaintiff at Reed Elsevier Co. However, the plaintiff testified that he had called that woman several times and did speak to her. In addition, Palcek gave the plaintiff a memo that was written to him from Bill McLaughlin, an editor of magazines for ICD. Previously, the plaintiff had a conversation with McLaughlin at the Christmas party at which time the plaintiff indicated to him that he was unhappy working at ICD because he was hired to do "big things" like big trade shows and make significant revenues for ICD. In doing so, he

himself would be rewarded with significant income. However, this was not happening. He also told McLaughlin:

> I felt bad for the company that they had this big expense but were not giving me an opportunity to make the kind of revenue for the company. And I couldn't continue to do these small things for the publishing division because it would never come up with the revenue that ICD needs to just pay my contract, let alone to make profits on it. So I felt bad for the company in that regard.

> I also felt bad because I couldn't make the kind of money that I was promised in enticing me away from a very good job, and I thought my career was being damaged in the process.

> So I thought everyone was losing. ICD was losing and I was losing.

(Tr. at 215, 216).

Cappiello also told McLaughlin that it would be okay if they wanted to "buy me out of the contract" or mediate their management so "we could both walk away happily." If not, he was going to fulfill his contract with ICD in any event.

On January 31, 2008 at the termination meeting, Palcek gave Cappiello a termination letter and a termination agreement. He was advised that if he signed the termination letter, he would receive two months salary, in exchange for waving his right to sue. Cappiello responded that he was not going to sign the separation agreement and was going to sue because there was no cause to fire him. At that point, Cappiello testified that Palcek threatened him.

Q. What was Mr. Palcek's response?

A. He threatened me.

Q. What kind of threat?

A. Two things. He said, one, you won't sue me because things will come out that you don't want out. He also said, you don't want to be a 50-year-old man, out of work, with a bad recommendation from your employer.

(Tr. at 219).

After his discharge from ICD, Cappiello made many attempts to obtain other employment. He prepared a new resumé, which he posted on job seeking websites; he contacted many publishing companies and other prospective employers; he retained a job hunter company; he looked in the newspapers; and, he went on two job interviews. In evidence is an eight page list of jobs that he applied for from a computer printout. (Pltf's Ex. 69). In addition, Cappiello went through new postings every one or two days, spending three or four hours a day responding to job postings. However, as of the time of the trial, he was unable to find a job. He did purchase a small bed and breakfast in North Corning, New Hampshire. Cappiello is still looking for employment.

The subject of off-site offices was raised during this trial. Cappiello testified that Gittlitz told him that he could work in an off-site office up to 5 days per month. He did work in an off-site office several times a month in August, September and October 2007. Cappiello pointed out that other executives at ICD worked at off-site offices, including Palcek and Evans, Andy Luchesi, Stacy Silver, Holly Kaye, and Alan Rolerri. Cappiello testified that he worked at his off-site office and communicated with his staff by phone and e-mail.

As to damages, Cappiello testified to the following monetary losses as a result of the January 31, 2008 termination of The Agreement.

| | | | |
|---|---|---|---|
| (1) | Base salary - $210,000 per year for two years and 121 days | | $489,616.14 |
| (2) | Commissions - a minimum of $60,000 per year for all 3 years | | $180,000.00 |
| (3) | Medical insurance premiums paid | | $39,425.33 |
| (4) | Dental insurance premiums paid | | $3,545.59 |
| | | Total Compensatory Damages | $712,587.06 |

On cross-examination, as to commissions, it was elicited from the plaintiff that the words in The Agreement regarding commissions, included, "based on performance of the Employee in achieving additional net sales for the company." Also, it was elicited from Cappiello that his off-site office was not in his home. It was the home of a woman named Michelle Roberts. Further, the terms with regard to his off-site or remote office which were negotiated with Gittlitz prior to signing The Agreement, were not included in the proposal letter or The Agreement.

In addition, as to the meeting with McLaughlin, Cappiello conceded that he called him an asshole.

Portions of the deposition of Cynthia Evans, an ICD co-owner, were read into evidence. She testified that it was the intention of the company that the plaintiff's commission program would reach $60,000 annually. She also conceded that the words "best efforts" do not appear in the Termination for Cause paragraph in The Agreement. In addition, Ms. Evans testified that the plaintiff "was really very engaging and did a good job."[**]

Q.    Do you remember ever hearing about good things Mr. Cappiello did?

A.    I heard that when he went on a sales call, he was really very engaging and did a good job.

*  *  *  *  *

Q.    Were there any other sales calls that Mr. Cappiello went on that you heard he had done a good job?

A.    On the call?

Q.    Correct.

[**] All overruled objections to the trial testimony and the depositions were omitted.

> A. I think Alan told me that he made - - he makes a very good impression, which was exciting to us.

(Tr. at 320, 321.)

When Ms. Evans was questioned about the reason for the plaintiff's termination, she stated: "I think dishonest. Dishonesty." (Tr. at 328). However, she conceded that she did not have any first hand knowledge with regard to his alleged dishonesty. It was Palcek who decided to terminate the plaintiff. "He was in control. He's the head of the company . . . He was responsible." (Tr. at 331, 332).

Portions of the deposition of James Schultz were also read into the record. Schultz stated that he didn't necessarily have a problem with Cappiello working from an off-site office, but that he probably would have been better off being in the home office. However, in that regard, Schultz conceded that other employees at ICD worked in off-site offices. On his part, he was having trouble motivating the plaintiff to follow through on assigned tasks. However, he testified that the plaintiff's termination was Palcek's call.

Portions of the deposition of David Palcek were also read into the record in the plaintiff's case. Palcek testified that it was the intent of ICD that the commissions for the plaintiff "will reach $60,000 annually." (Tr. at 343). Also, the plaintiff would be entitled to health insurance and disability benefits as outlined in the ICD Employee Handbook. Palcek also testified that the plaintiff was terminated for cause for "dishonesty, disloyalty and not providing best efforts to the company," but not for a felony or a crime involving moral turpitude. (Tr. at 345). He also stated that Cappiello did not engage in fraud, to his knowledge. Significantly, Palcek testified in his deposition that in The Agreement in the paragraphs entitled "term" and "cause" it does not state that the plaintiff can be terminated for not devoting his best efforts.

11

Q. It doesn't say anywhere in that paragraph that he can be terminated. I'm just asking based upon your review of the paragraph and I will get to the just cause definition in a minute, it doesn't state anywhere in that paragraph that he can be terminated for failing to put his best - -

A. No, it doesn't say that.

Q. I'm not quite finished with my question. I wanted to say it right this time.

A. Okay.

Q. For not devoting his best efforts, isn't that correct?

A. It is not stated in the paragraph, that is correct.

\* \* \* \* \*

Q. Now we are going back to the page we were previously on and I would like you to read the definition of "cause," also capitalized and in quotes, in the definition section to yourself and then I'm going to ask the next question.

A. Just the first paragraph or all of it?

Q. Just the definition of "cause."

A. All right.

Q. In that definition of cause that you just read, does it say anywhere that Mr. Cappiello can be terminated for failing to devote his best efforts?

A. It is not in that paragraph.

(Tr. at 350-352).

In this regard, the Court notes that a review of The Agreement reveals that nowhere does it say that the plaintiff could be terminated for not devoting his best efforts to the job.

Palcek testified in his deposition that Cappiello did commit an act of dishonesty with respect to the company, as follows:

Q. Had Mr. Cappiello committed any act of dishonesty with respect to the company?

A.      Yes.

Q.      What was that act?

A.      As far as dishonesty is concerned, Mr. Cappiello was to contact Reed for a name. It is subject for debate as to whether he did it or not but he never reported back to us that he did and a name wasn't available.

* * * * *

Q.      We will get to that.

Do you have any firsthand knowledge as to whether he contacted Beth Blake?

A.      No.

(Tr. at 352, 353).

Palcek also testified that Cappiello did commit an act of disloyalty; namely, in his conversation with Bill McLaughlin, as follows:

Q.      With regard to [disloyalty], what specific acts do you claim substantiate your claim of disloyalty?

A.      Rob's conversation with Bill McLaughlin.

(Tr. at 353).

Further information concerning the "Beth Blake" or Reed Elsevier Co. incident raised by Palcek and referred to as dishonesty on the part of the plaintiff was furnished in the deposition of Peter Giannetti.

Q.      Okay.  Let's talk about the person he was going to or was asked to contact.

A.      Okay.

Q.      Who was that person?

A.      Beth Blake.

Q.      Where does Beth Blake work?

A.      At Reed.

Q.      Who asked him to contact Beth?

A.      I don't know.

*   *   *   *   *

Q.      Who knew that he knew someone at Reed named Beth Blake?

A.      I did.

Q.      How did you know that?

A.      Because I have worked with Beth and I know Beth.

Q.      Do you know what Beth's position at Reed is or was at that time.

A.      Not specifically but she was involved - - like director of marketing and communications.  I'm not exactly sure what her title was or is.

Q.      What specifically was Mr. Cappiello asked to do?

A.      To get a contact name at Home & Garden Television.

Q.      Why was Mr. Cappiello asked to do this?

A.      I don't know.  Because he knew Beth.

Q.      You also knew Beth?

A.      Yes.

Q.      You weren't asked to do this at this time, were you?

A.      No.

*   *   *   *   *

Q.      During this conversation with Beth Blake, tell me what she said to you and what you said to her.

A.      I asked if Rob had tried to contact her at any time regarding Home & Garden

14

Television.

Q.     And what did she say to you?

A.     As I recall, she didn't answer that question.

Q.     What did she say next?

A.     Nothing and I didn't push the question.

*   *   *   *   *

Q.     When you spoke to Beth, she never explicitly told you that Rob hadn't called her, isn't that correct?

A.     There was no answer to my question.

Q.     That's not what I'm asking. She never said the words, quote, Rob never called, end quote, isn't that correct.

A.     I don't recall those words.

Q.     Subsequent to your conversation with Beth, have you ever called her and said: Hey Beth, did Rob ever call you?

A.     No; I don't recall that.

Q.     So you have never explicitly asked her if Rob called?

A.     No. Not that I'm aware of. I don't recall.

*   *   *   *   *

Q.     Did you ever tell Dave that you didn't think Rob called her?

A.     I don't recall telling Dave that.

(Tr. at 360-365).

The final part of the plaintiff's case was a reading of portions of the deposition testimony of William McLaughlin. In his testimony, McLaughlin related that Home World Business put out an article in about the spring of 2007 called the Players. He and Peter Giannetti were

15

involved in writing this article. It was "a who to watch in the industry type of article." (Tr. at 373). Robert Cappiello was on this list.

With regard to the charges of disloyalty raised by Palchek involving McLaughlin's conversation with the plaintiff, McLaughlin refuted that charge as follows:

> Q.  Do you think that Mr. Cappiello speaking to you about being unhappy was disloyal?
>
> A.  I do not.

*   *   *   *   *

> Q.  What do you define disloyalty as?
>
> A.  Actions - - in what context?
>
> Q.  Just your general definition of disloyalty.
>
> A.  In personal or professional situations?
>
> Q.  Just your general definition. Being the historian that you are, what would you define disloyalty as?
>
> A.  Failure to engage in loyal behavior.
>
> Q.  Based upon your professional definition of disloyalty, would you state that Mr. Cappiello in speaking to you about his being unhappy at ICD constituted disloyalty?
>
> A.  Speaking about it? No.
>
> Q.  Are you aware of anything in your own personnel definition of disloyalty that Mr. Cappiello did while working at ICD that constitutes or rises to your definition of disloyalty?
>
> A.  I am unaware.

(Tr. at 373, 374).

**B.  The Defendant's Case**

James Schultz formerly worked for ICD from 1992 to 2005 or 2006. He didn't see eye to eye with Ian Gittlitz and left. In July 2007 he returned to ICD. His job title at ICD was Senior Vice President of the Hospitality Group. He had oversight of the Hospitality Group, including publications and the roundtable series. At that time, the plaintiff was Vice President of Conferences and Events and Interim Group Publisher. Schultz had total oversight of the entire group. The plaintiff's primary responsibilities were sales, marketing, promotions and driving the sales effort. There were 35 to 40 employees at ICD. Everyone in the Hospitality Group, including himself and Cappiello, plan menus, coordinate travel and make hotel reservations. A roundtable is a small think tank event and a summit is a larger conference think tank with almost 200 people participating.

In the summer of 2007, Schultz worked closely with the plaintiff, especially due to the fact that the former president and three senior executives were no longer employed by ICD. The plaintiff's primary responsibilities were to "watch the store" while he was away and watch the sales people and attempt to maintain the revenue. In his opinion, Cappiello did not adequately perform these duties.

Schultz testified as to the editorial calendars, which are road maps by which editors and sales people follow for the entire year and are the single most important documents created every year. He reviewed the 2008 Editorial Calendar for Hotel Business Magazine, and stated that it was not complete. It looked like a cut and paste from a previous year; and was about "ten minutes worth of work." (Tr. at 403). It was Cappiello's responsibility to complete the editorial calendar for 2008. Schultz testified that Cappiello did not complete the task and his performance was not acceptable.

Q.      Was it expected of a group publisher with over 25 years of experience in the publishing industry to adequately supervise employees and get the editorial calendar completed as scheduled?

A.      Yes.

Q.      Did Mr. Cappiello do that?

A.      He did not.

*   *   *   *   *   *

Q.      How important are these calendars to ICD business?

A.      Again, the editorial calendar is the single most important document we create every year.  It is our road map for revenue.

Q.      And were you satisfied with Mr. Cappiello's performance?

A.      No.

Q.      In your opinion, was Mr. Cappiello's performance acceptable?

A.      It was not.

*   *   *   *   *   *

Q.      How would you categorize Mr. Cappiello's efforts in putting together the 2008 editorial calendars?

A.      For the editorial calendars, I think it's worse than careless.

Q.      Can you please elaborate?

A.      Again, this is the road map to the revenue for the following year.  We generate revenue, we make payroll, we pay our bills based on advertising that's sold based on this edit calendar.

*   *   *   *   *   *

Q.      In your opinion, is the 2008 calendar the work product of a dedicated employee of ICD?

A.      A product that he - - I never saw a final product from Mr. Cappiello.  I did the

final product.

* * * * *

Q.	What were your expectations of Mr. Cappiello in putting together the 2008 calendar?

A.	Based on the discussions that he and I had, he was going to take what we have done in the past and enhance it and so my expectations were pretty high because we have put out good pieces in the past. And to be told we were going to have a better piece, I was looking forward to seeing that.

Q.	Did Mr. Cappiello meet your expectations?

A.	He did not.

Q.	How would you categorize Mr. Cappiello's efforts?

A.	Disappointing.

(Tr. at 407, 411-415).

In addition, Schultz discussed a roundtable in Miami at the Palms Hotel in 2007. Apparently, there was a mix up with regard to the identity of the correct hotel. As a result, one sponsor did not attend the event. Schultz described the performance of Cappiello in this regard as "careless." (Tr. at 424). In addition, Cappiello was responsible for creating the "tent cards" for the roundtable in Miami for 2007. However, he did not create the tent cards, and, according to Schultz, the cards he did create, "looked bush league," (Tr. at 426) and "it was carelessness." (Tr. at 427). Further, Schultz testified that he was also not satisfied with Cappiello's efforts with regard to organizing and developing a "sea level roundtable." As a result, ICD did not get that business. Also, the plaintiff was responsible for creating a proposal for Hunter Douglas Hospitality. He had to do it as soon as possible. According to Schultz it took the plaintiff a month to create the proposal. Again, according to Schultz, that was not acceptable.

Schultz described other matters, buttressed by e-mails in evidence, in which he encouraged Cappiello to be more proactive in scheduling trips with the sales representatives; to actively sell the ICD digital products; and to "drive sales marketing." (Tr. at 449). Apparently, Cappiello only took four flights on sales trips which was "irregular" and unacceptable to Schultz. It was critical for Cappiello to be out meeting potential clients and advertisers. However, the plaintiff made sales calls that did not require flights, namely to Westchester, New Jersey and Washington, D.C. According to Schultz, Cappiello's "heart was not into it and he just wasn't making the effort." (Tr. at 452). With regard to these and other matters, Schultz concluded that Cappiello was "[a]pathetic. Apathy. It just didn't seem to be important to him." (Tr. at 462).

Schultz also was of the opinion that in the New York City Hotel Show, the plaintiff was expected to visit the other booths with the sales persons and the hundreds of potential advertisers under one roof. Instead, during most of the show, the plaintiff just sat in the booth, instead of being out there "pressing the flesh." This time, Schultz got angry at the plaintiff, "it was so wrong." (Tr. at 472). However, Schultz admitted he never told the plaintiff to walk the floor and advertisers do come by the booth. Also he conceded that the plaintiff did spend some time walking the floor.

Schultz further testified that after the departure of a sales manager, the plaintiff was assigned the Classic Coffee account. According to Schultz, Cappiello did not contact Classic Coffee for six weeks. Again, Schultz testified that it wasn't a priority for Cappiello, it wasn't acceptable, and, as a result, Classic Coffee cancelled their contract with ICD. In his opinion, Cappiello didn't care.

Interestingly, when Schultz first met the plaintiff, at a backyard barbecue, he was "kind

of impressed" and he asked Palcek, "[h]ow long can I have him." However, over the course of

the next seven months, his opinion of the plaintiff changed, and he questioned his "desire to

perform."

> Q. In your opinion, did Mr. Cappiello perform his job duties between July of 2007 and January of 2008?
>
> A. He did not.
>
> Q. Can you elaborate, please?
>
> A. Again, consistently, aside from some of the tasks that were assigned that didn't become completed, there was also not a lot of initiative taken. There was not - - you know, this is a creative business. And based on some of the stories he had told, he had done creative things in the past, but he wasn't using his creative ability at ICD.

(Tr. at 492).

Schultz spoke to CEO Palcek periodically about the plaintiff's performance. However,

he did feel that the plaintiff was "a talented guy and I did need him." (Tr. at 496). Also, he

stated that initially, he was "part of the team" (Tr. at 500), but he did not work as hard as other

members of the team and made more mistakes. He expected more of the plaintiff. Also, Schultz

testified that he attended one sales call with the plaintiff and he was "pretty good."

> Q. Did you ever personally attend a sales call with Mr. Cappiello?
>
> A. Yes.
>
> Q. How many?
>
> A. I only remember one, I think. One.
>
> Q. What was your impression of Mr. Cappiello during that sales call?
>
> A. He was pretty good. I mean, he was solid. His presentation skills were solid. His knack of conversation was good. He was pretty good.

21

(Tr. at 504, 505).

However, Schultz complained that Cappiello failed to properly follow up the sales call and sent over a proposal that was far below the standard.

On cross-examination, Schultz stated that the content of the editorial calendars that the plaintiff drafted was "fine," even though it was incomplete. Also, he conceded that the plaintiff was working on a number of projects at the same time as the editorial calendars and that the company was in a crisis mode. In addition, while he discussed the plaintiff's responsibilities with him on many occasions, he never gave him a written job description. Further, as to the Starwood job, the plaintiff did a good presentation, even though he left out a few things. Also, it is clear that although Cappiello was hired by Gittlitz at least in part to do trade shows, he was not permitted to do any. "The industry didn't need another one." (Tr. at 602).

William T. McLaughlin, is a middle manager at ICD. He is an important witness in this case. His experience with the plaintiff was relied upon by Palcek in his opinion as to the plaintiff's performance. He is the Executive Editor of Homeworld Business Magazine and a writer for the publication. ICD is made up of two groups, a retail group and a hospitality group. He is part of the retail group. In June 2007, three high employees of ICD resigned and in July 2007, Ian Gittlitz was terminated by Palcek and Evans. He first met the plaintiff in 2007 just prior to his employment at ICD. McLaughlin worked with the plaintiff in the summer of 2007 with regard to an editorial calendar.

In December 2007, at the Christmas office party, McLaughlin had a conversation with the plaintiff, which the defendant ICD is relying on, with regard to its defense of "disloyalty." McLaughlin testified as to the substance of the conversation.

Q.      And what did Mr. Cappiello say to you during that conversation?

A.      Mr. Cappiello said that he was very unhappy in his current position at ICD, that he had been brought on to do trade shows and he was not being permitted to do those trade show.

Q.      Did Mr. Cappiello say anything else?

A.      He said that he was being asked to do tasks that he considered menial.  He said that he had served earlier in his career in a publishing capacity, and while he could do that, he really had no interest in doing that any further.

        He said that he felt his career was being damaged by this position.

        He mentioned his compensation was tied to the performance of the trade shows and that the failure to execute those trade shows was causing him financial discomfort or harm.

Q.      Did Mr. Cappiello say anything else?

A.      He said that in his current situation, he believed there were only three resolutions to his situation.

Q.      What were those resolutions?

A.      He expressed that he could quit his position, which he said he had no intention of doing.  He said that the company could buy him out at the full value of his contract, or he said that the company could fire him, in which case some kind of proceeding to resolve his financial situation, such as we have here today, would result.

Q.      And did Mr. Cappiello say that he could help ICD in his current position?

A.      I believe I've already testified that he said that he could perform those duties but that he really did not feel they were things we was interested in doing.

                        *    *    *    *    *

Q.      Did Mr. Cappiello express an opinion as to his willingness to perform those duties?

A.      He did.

Q.      And what was that opinion?

A.      He said that he had no interest in performing those duties.

Q. Did any other employee of ICD ever tell you that Mr. Cappiello was hired to do trade shows?

A. No.

\* \* \* \* \*

Q. What did you say to Mr. Cappiello in response?

A. I told him that he should address his concerns to someone who is in a position to change the circumstances.

Q. Were you in a position to change the circumstances?

A. No, I was not.

(Tr. at 635-637).

After this conversation, McLaughlin told co-employee Peter Giannetti that the plaintiff was attempting to provoke a confrontation. In addition, McLaughlin was asked to define "disloyalty."

Q. Mr. McLaughlin, how do you define disloyalty?

A. I define it as an act of not being loyal to a person or entity to which you have some obligation of loyalty.

Q. And what do you consider provoking a confrontation with your employer?

A. I think that would be classified as to a disloyal act.

(Tr. at 639).

However, the Court notes that there is no evidence in this record that the plaintiff provoked a confrontation with his employer. Also, McLaughlin testified that (1) he was not familiar with Cappiello's performance of his duties during his tenure at ICD, and (2) he only worked on one project with Cappiello. However, strangely, McLaughlin also testified that on January 31, 2008, at the end of the day, Cappiello walked into his office and said: "You're an

asshole." (Tr. at 640).

On cross-examination, McLaughlin was asked about the same conversation with Cappiello that he related on his direct examination and relied on by the defendants as a reason for discharging the plaintiff:

> Q.   Now, you testified during your direct examination that Mr. Cappiello was concerned with his compensation package; isn't that correct?
>
> A.   I testified that Mr. Cappiello said that his compensation was affected by his inability to do trade shows.
>
> Q.   And that Mr. Cappiello was frustrated because ICD wasn't permitting him to do the job that he was hired to do?
>
> A.   In sum and substance, yes.
>
> Q.   And he was frustrated because his performance-based commissions or bonuses were based upon the sales of these trade shows; isn't that correct?
>
> A.   Yes.
>
> Q.   And he was frustrated because he wasn't being permitted to do that job?
>
> A.   He expressed that he was frustrated because he was not being permitted to do trade shows.

(Tr. at 647, 648).

Significantly, in his deposition, McLaughlin was also asked questions about the alleged ICD "disloyalty defense" based on the plaintiff's conversation with McLaughlin.

> Q.   Do you think that Mr. Cappiello's speaking to you about being unhappy is disloyal?
>
> A.   I do not.

*     *     *     *     *

25

Q.     Just give me your general definition of disloyalty?

A.     In a personal or profession situation?

Q.     Just your general definition, being the attorney that you are.  What would you define disloyalty as?

A.     Failure to engage in loyal behavior.

                    *     *     *     *     *

Q.     Based upon your professional definition of disloyalty, would you state that Mr. Cappiello, speaking with you about being unhappy - - I'm sorry - - about his being unhappy at ICD constituted disloyalty?

A.     Speaking about it, no.

Q.     Are you aware of anything in your own personal definition of disloyalty that Mr. Cappiello did while working at ICD that would constitute disloyalty?

A.     I'm unaware.

(Tr. at 648-650).

Further, McLaughlin was asked - in the usual fashion - whether his answers at this deposition were as accurate "today as they were on the date of your deposition."  His answer was, "As I expressed them there, yes."  On cross-examination, Schultz was asked a final question.

Q.     You are not aware of Mr. Cappiello taking any actions of disloyalty against the company, are you?

A.     I have no knowledge.

(Tr. at 650, 651).

On redirect, in an effort to rehabilitate McLaughlin, he was again questioned about this conversation with the plaintiff.  At this point, McLaughlin testified that it was his belief that, in

the conversation at issue, Cappiello was attempting to provoke a confrontation with ICD.  He

further stated that if he "acted" on that sooner, as opposed to speaking in that manner, that would

constitute disloyalty.  McLaughlin also stated that if an ICD employee failed to perform his

duties that would be disloyalty.  However, the final question to McLaughlin again raised

questions about any so-called disloyalty by the plaintiff.

Q.      Okay.  So I'll take your own language.

Other than speaking to you, you have no knowledge that Mr. Cappiello did

any acts of disloyalty towards ICD?

A.      That's correct.

(Tr. at 653).

Peter Giannetti, was employed by ICD in February 1990, as an Assistant Editor.  He was

promoted in several steps to Editor In Chief of Homeworld, General Manager of the ICD New

York office and Vice-President of Editorial and Publishing Operations for the entire company.

Between June 2007 and November 2007 he had occasion to work with the plaintiff on the

Houseware Design Awards and the editorial calendars.  The plaintiff explained that he was

having difficulty getting the editorial calendars produced through the ICD Art Department and

asked Giannetti if he could get an outside graphic artist to help produce the calendars.  Giannetti

responded that he would look into that and it was not a bad idea.

HGTV is an acronym for Home and Garden TV.  ICD wanted HGTV to sponsor certain

awards.  At the request of Palcek, Giannetti spoke to the plaintiff to find out if he had gotten "the

contact name" at HGTV, which information was his responsibility to obtain; among other

obligations at the Marriott Hotel.  The plaintiff responded that their liaison was no longer there

and he couldn't get the information or, it wasn't available.

Beth Blake is the Manager or Director of Communications for the National Hardware Show at Reed Elsevier. The plaintiff knew Beth Blake and was going to call her to obtain the contact information at HGTV. Giannetti asked Ms. Blake if the plaintiff called her to obtain the name of contact at HGTV. His answer to that question was ruled inadmissible. However, Giannetti did receive the contact information from Ms. Blake and HGTV on January 11, 2008.

On cross-examination, Giannetti stated that the plaintiff expressed a desire to create a trade show on a number of occasions. In his deposition, Giannetti testified that he was advised that the plaintiff did a good job on a sales call.

David Palcek is the President and CEO of ICD. He was the final witness at the trial. In June of 1989, he, Cindy Evans and Ian Gittlitz founded ICD Publications. They also launched the Homeworld Business Magazine and he was the National Advertising Director. Gittlitz was the President and CEO. In January 2007, he and Evans discovered that Gittlitz was stealing money from the company. Gittlitz had been negotiating with the plaintiff, who was the general manager of a successful hardware show. At that time, it was possible that Gittlitz may no longer be at the company "and that someone with Rob's background . . . would give us experience, bench strength and be a welcome addition to the company, whether Mr. Gittlitz was there or not." (Tr. at 788).

Palcek saw the initial Preliminary Proposal Sheet ("The Proposal") for Robert Cappiello on July 2, 2007, after The Agreement was signed. The Proposal was signed by Ian Gittlitz. The compensation paragraph read as follows:

> ◆ Compensation shall be $210,000 base salary. In addition, a
> performance-based commission plan based on revenues from

> existing and new businesses will be designed to reach $60,000 in
> the first full year of the employment agreement.  However,
> commission compensation package shall not be capped at $60,000.

The Agreement itself was signed on June 11, 2007.  Among the clauses in The

Agreement was the paragraphs entitled "Position and Duties."  This paragraph states, in part, that

the "Employee shall devote employee's best efforts and . . .  full business time and attention

(except for permitted vacation periods, leaves of absences, and periods of illness or other

incapacity) to the business and affairs of the Company."  (Pltf's Ex. 8).  As to the commissions

paragraph – which present a genuine issue in this case – as stated above, it reads as follows:

> Employee shall be entitled to commissions (the "Commissions")
> based on performance, at a schedule to be determined upon the
> starting date (above).  However, it is the intent of the Employer to
> design a commission program which will reach $60,000 annually,
> based on performance of the Employee in achieving additional net
> sales for the Company.

On June 29, 2007, the three senior executives of the Hospitality Group resigned together.

These executives represented 60 to 70 years of experience and contacts in the Hospitality

industry, and represented 40% of the revenue of the company.  Palcek discussed this situation

with the plaintiff.  He asked the plaintiff to add to his responsibilities as Interim Publisher of the

Hospitality Group.  The plaintiff said he would be happy to do it.  James Schultz returned to ICD

in mid-July 2007, also because of the resignation of the three executives.  He was to be Senior

Vice President with power over all aspects of the group and the editorial calendars.  As the

Interim Publisher, the plaintiff reported to Schultz.

Palcek testified that ICD was a small company with 35 employees and did not have the

manpower to do large events.  ICD would do small events like roundtables.  Palcek testified at

length as to the plaintiff's performance.  As to the editorial calendars, the plaintiff said he called

outside vendors to assist them, but they never returned his calls. Palcek did not believe that. In his view, the plaintiff failed to contact any outside agencies for the editorial calendars. On two occasions, the plaintiff made hotel reservations for Miami and New York. He also made reservations for the staff. Palcek was asked to approve business cards for the plaintiff but did not do so because the situation was too fluid as to jobs.

There was a New York City Hotel Show at the Javits Center from November 11, 2007 to November 13, 2007. Palcek was absolutely stunned by what he saw at the show. He saw Cappiello, the senior executive of the Group, spending the majority of his time sitting in the ICD booth, rather than walking the show so as to see customers, sales people and exhibitors. Palcek did not approve of the plaintiff's performance at that show.

Palcek had a problem with the plaintiff's alleged off-site office. The plaintiff told him that Gittlitz advised him that he could work up to five days a month at his off-site office. Palcek agreed to this arrangement. Other employees in the company also had off-site offices. In September 2007 the plaintiff told Palcek that his off-site office was at his home in Toronto with a woman he was involved with; something he was not proud of doing. The woman's name was Michele Roberts. Palcek testified that at that point he not prohibit this conduct and he reluctantly allowed it to continue.

However, Palcek was not pleased – to say the least – with the plaintiff's off-site office. On November 21, 2007, he wrote e-mails to the plaintiff expressing his displeasure and suspended Cappiello's off-site parking privilege for the balance of the year 2007.

> Rob,
>
> I am of the belief that the time you spend in your "home/off site office" is not working in the best interest if ICD. I was surprised

and disappointed that while the Hotel Business sales staff were either traveling or in their primary office working on follow up after the show, you decided to work from your off site office.

* * * * *

In September, you were responsible for several projects regarding editorial calendars and promotional materials. Around the time frame of being out of the office for several days for HD boutique, you elected to extend your time out of the office to be at your off site office. The projects were late.

I had directed you to "clear" home/off site office days with Jay. I see you are planning to take two more days next week. Jay received an e-mail from you at 3 pm EST today informing him you would be out and to let him know if that was a problem. Jay was on a plane at that time. I don't consider today's e-mail to be anywhere in the definition of clearing it with Jay. As a result, the policy is changing as of today. Your home/off site days must be approved by me. Next week's are not. Nor will I approve ANY off site/home office days the remainder of 2007. You are welcome to request vacation time, if you have any remaining.

* * * * *

Rob, we have heard of the strong contribution you have made a (sic) some selected sales calls. However, the judgment you have displayed in handling the off site/home office situation and questions regarding follow up on certain projects and tasks are concerning to us. When Cyndi and I are in Long Island 12/13 and 12/14, we can discuss this further.

Dave

(Dfts' Ex. D).

On December 14, 2007, Palcek and Cindy Evans had a meeting with the plaintiff. During the meeting, Palcek made handwritten notes, which are in evidence. (Pltf's Ex. 63). Palcek complained about a number of the plaintiff's activities. He was concerned with the plaintiff's continuing pattern of "lack of follow through" and insubordination.

Q.      Was it Mr. Cappiello's responsibility to report his progress to you?

A.     Yes, it was.

Q.     What was your reaction when Mr. Cappiello did not report his progress?

A.     My reaction was that this was continuing a pattern of lack of follow
       through, insubordination and the makings of a disgruntled employee that
       chose not to perform the duties that he was asked to with his best efforts.

(Tr. at 780).

The plaintiff was visibly upset when told by Palcek that he was cancelling his off-site office privileges. He had relied on the promises of Ian Gittlitz. The off-site office situation was not in The Agreement or in the preliminary proposal sheet or in any documentation. Although Palcek agreed to provide Cappiello with a written job description, he never did.

On December 17, 2007, Palcek and Cindy Evans received an e-mail from Giannetti, in which he expressed concerns about the plaintiff. He related the conversation the plaintiff had with McLaughlin in which the plaintiff implied that he would prefer to leave ICD. The plaintiff had cited three options, although he said he would not quit the company. The other options were that ICD could buy him out at the full value of the contract or that the parties could seek some form of third-party mediation. At that time, the plaintiff said that his career had been "damaged" because of his situation at ICD. In this e-mail, Giannetti commented that he was "concerned about the potential for such conversations to undermine the morale of individuals at the company . . ." (Dfts' Ex. H).

After these situations, Palcek began to assess what he referred to as a "pattern of disloyal acts, lack of follow through, dishonesty, blatant, in my opinion as president of the company, lack of best efforts from an employee that had a senior management position and was paid a six-figure income . . ." (Tr. at 794). Palcek discussed the termination of Cappiello with Cindy Evans and ICD did terminate the plaintiff on January 31, 2008. Palcek described the alleged

"disloyal acts" and "dishonesty".

Q.     You mentioned disloyal acts?

A.     Yes.

Q.     What did you think were disloyal acts?

A.     I thought the crowning disloyal act was his behavior at the Hotel Show by spending all the time he did in the booth. He just absolutely knows better. Again, I have been doing this for 28 years. That just doesn't happen. That's a statement of insubordination.

       I believe that the conversation that I had with Bill McLoughlin drew me to two conclusions about that. Number 1, that the conversation was disloyal. Number 2, that it explained a lot of things because he - - it explained a lot of things because he was absolutely demonstrating that he had absolutely no plan to give his best efforts to the tasks that he had been assigned.

Q.     You mentioned dishonesty. Can you please elaborate?

A.     I think dishonesty and best efforts go hand in hand. I think that someone at his level that is assigned tasks and either doesn't complete them or doesn't report back to the people that have assigned them to him, at least in the few things I was involved in assigning to him, is an act of dishonesty and integrity. They all go hand in hand.

                    *     *     *     *     *

Q.     Do you have anything else to say about dishonesty?

A.     I believe that when you work for an employer, you have two choices, you give it your best effort, perform your tasks to the best of your ability or you go work somewhere else. When you are a senior manager making a significant income, especially in the economic times that we have gone through the last few years, I think that that responsibility is even more magnified, not just to what you owe to the company but your performance, your efforts, your honesty, your loyalty, your integrity all factor into 35 people collecting a paycheck and supporting their families. It's a greater responsibility when you are a senior manager.

       We are ICD Publications. We are 32, 33, 35 people but we all take that responsibility very seriously as senior management of the company.

(Tr. at 796-798).

33

On January 31, 2008, Palcek met with the plaintiff in the conference room of the East Setauket office. Also present was Giannetti and Schultz. The purpose of the meeting was to terminate the plaintiff. Palcek told the plaintiff he was terminating him for cause, including acts of dishonesty and disloyalty. He presented the plaintiff with the proposed Separation Agreement and General Release. The plaintiff was very agitated about the financial arrangements in the Separation Agreement, and also for making him wait until 4:00 pm before advising him of his termination. Palcek never spoke to the plaintiff again after that day. He summed up the reasons for the plaintiff's termination as disloyalty, dishonesty and failure to use his best efforts which would affect the morale of the other employees of ICD.

On cross-examination, Palcek testified that the plaintiff was not hired to create a trade show and conference division. However, in his answers to interrogatories Palcek stated that "it was their intention to have plaintiff initiate and set up a trade show and conference division . . . and reach out to existing trade show companies to achieve a joint venture." (Tr. at 818). Palcek also stated that he was not involved in the negotiation of plaintiff's contract. With regard to the issue of commissions, Palcek testified that other managerial employees also received commissions. In addition, apparently the plaintiff's services were not all inadequate because on September 11, 2007, Palcek sent him an e-mail, with a copy to Cindy Evans, which tended to be complimentary.

Subject: Re: HD Boutique Show

Rob,

Thank you for taking care of the hotel reservations for Cyndi and I. We appreciate the commitment you have demonstrated to your multi faceted responsibilities at ICD and the limited days out of the office. I am fine with the number of days. I would request that you coordinate the specific days with Jay

and give Peter advance notice.

Dave

Also, Palcek testified that when he ordered the plaintiff not to work at his off-site office,

he complied.  Contrary to his conclusions at the trial, Palcek was also complimentary to

Cappiello on October 20, 2007, with regard to other work done by the plaintiff.

From:  DaveP
Sent:  Saturday, October 20, 2007 12:37 PM
To: robertc
Cc:  Cyndi
Subject:  sales calls/HDA

Rob,

Just wanted you to know I heard how strong you were on the Starwood and
Choice calls.  Most impressive from someone outside the industry.  I can't say I
am surprised.  I hear you will be on more calls.  That's great!

On the Housewares front, our conference call with Linda and subsequent follow
up by her agency has been a welcome addition to the process.  It is paramount to
HomeWorld that the 2008 event be the best ever and with the plans we will put
into place, the 2009 event will take the event to another level.  I trust that you will
continue to be actively involved from both a management and hands on
perspective to ensure our objectives are achieved.

Cyndi and I are aware that your compensation package with ICD was based on
bonus tied to criteria established by the former President.  Sometime in December
we will review the structure of your bonus plan and discuss how we can devise a
plan that accurately reflects your responsibilities and appropriately rewards your
contribution to the success of ICD.

Dave


From:  Robert Cappiello
Sent:  Monday, October 22, 2007 8:48 AM
To:  DaveP
Cc:  Cyndi
Subject:  RE: sales calls/HDA

Thank you, Dave, I appreciate it.

Rob

(Pltf's Ex. 51).

Questioned on cross-examination about the reasons for the plaintiff's termination on January 31, 2008, Palcek stated there was only one example of the plaintiff's dishonesty, the Beth Blake issue.

> Q. With regard to dishonesty, do you recall what acts you discussed with Mr. Cappiello that you thought was dishonest?
>
> A. I believe it was the Beth Blake issue.
>
> Q. So Beth Blake was your example of dishonesty?
>
> A. It was an example, yes.
>
> Q. You didn't give him any other examples at that meeting?
>
> A. No, not at that meeting.

(Tr. at 890).

As to the alleged claim of disloyalty on the part of Cappiello, it apparently was based on the plaintiff's conversation with McLaughlin, which the Court has already described in detail.

> Q. And the third reason was disloyalty?
>
> A. That's correct.
>
> Q. And you claim Mr. Cappiello was disloyal, and that was hinging around the conversation with Mr. McLaughlin; is that correct?
>
> A. I can't answer that with a yes or no answer.
>
> Q. You told Mr. Cappiello during this meeting that you felt his conversation with Mr. McLaughlin was disloyal; is that correct?
>
> A. Yes.

A.      That's correct.

                    *    *    *    *    *

Q.      Was there any other acts other than Mr. Cappiello's conversations with Bill that
        you considered disloyalty?

A.      Did I consider or discuss with him?

Q.      That you discussed with him as disloyal?

A.      In the termination meeting, I believe that was the only one I discussed.

(Tr. at 888-890).

Also, with regard to the claim that the plaintiff did not devote his best efforts to the job,

Palcek stated that it was his consistent lack of following through.

Q.      So with regard to best efforts, you contended that Mr. Cappiello failed to devote
        his best efforts.  What did you mean by that?

A.      Consistent lack to follow through on - - lack of follow through on tasks, I believe,
        is what I may have said at that meeting.

Q.      Now, Mr. Cappiello didn't report to you; is that correct?

A.      Directly?

Q.      Yes.
A.      For the vast majority of his responsibility, no, he did not.

Q.      With regard to the New York City show, would you consider that a lack of follow
        through - - I'm sorry, with the Wyndham presentation?

A.      I can't answer that with a yes or no.

Q.      Okay.

                Did you give Mr. Cappiello any specific examples of why you
        thought he failed to devote his best efforts?

A.      I don't recall that if I did.

Q.      Other than those examples, did you give Mr. Cappiello any other reasons why you were terminating him?

A.      Just the three, best efforts, dishonesty and disloyalty.

(Tr. at 890, 891).

Palcek testified that the plaintiff was terminated because of dishonesty in the Beth Blake matter and disloyalty arising out of the conversation with McLaughlin. He conceded however, that no other employees at ICD came to him and indicated that Cappiello was unhappy at ICD, except for McLaughlin.

## IV.  INITIAL FINDING OF FACTS

1.   On June 11, 2007, the plaintiff entered into an Employment Agreement ("The Agreement"). His base annual salary was $210,000, together with commissions based on performance, at a schedule to be determined, with the intent of the employer ICD "to design a commission program which will reach $60,000 annually, based on performance of the employee in achieving additional net sales for the Company."

2.   The term of The Agreement was from June 11, 2007 to June 1, 2010, unless terminated for cause.

3.   By the terms of The Agreement, "cause" means the commission of a felony or a crime involving moral turpitude, or the commission of any other act involving dishonesty, disloyalty or fraud with respect to the Company. Failure to devote his "best efforts" was not a ground to terminate the plaintiff under the terms of The Agreement.

4.   In addition, by the terms of The Agreement, the plaintiff shall be entitled to "health insurance and disability insurance as outlined in the ICD Employee Handbook," subject to employee contributions.

5. Absent death, permanent disability or incapacity, The Agreement could not be terminated by ICD except by "cause" as defined in The Agreement.

6. The plaintiff was a trade show veteran and was hired by Gittlitz essentially for that reason. Then Gittlitz was terminated and Palcek apparently considered the trade show to be a bad idea. He didn't want to create a trade show division and gave the plaintiff a role as a Group Publisher and also gave him menial tasks.

7. The plaintiff was employed by Ian Gittlitz to create the trade show and conference division. Palcek did not want to create the division the plaintiff was hired to form, and wanted to do away with the $210,000 in compensation plus commissions to the plaintiff.

8. Under the terms of The Agreement, the plaintiff could not be terminated for allegedly failing to devote his best efforts.

9. The plaintiff was not terminated for the commission of a felony or a crime of moral turpitude or fraud with respect to ICD.

10. The plaintiff attempted and continues to attempt to mitigate his damages.

## V. <u>DISCUSSION</u>

### A. <u>Choice of Law</u>

Pursuant to the terms of The Agreement at page 6, the parties agreed that all disputes under The Agreement shall be governed by Illinois law. However, the parties stipulated that Illinois law regarding the enforcement of contracts is virtually identical to New York law. In addition, the parties further stipulated that, New York law applies to the cause of action for tortious interference with a contract.

### B. <u>The Breach of Contract Cause of Action</u>

Under Illinois and New York law, unambiguous contracts are to be given their plain meaning and are to be enforced by their terms.  See Yamnitz v. William J. Diestelharst Co., Inc., 251 Ill. App.3d 244, 251-252, 621 N.E.2d 1046, 1051-1052 (4th Dist. 1993); Reynolds v. Coleman, 173 Ill. App.3d 585, 593, 527 N.E.2d 897, 903 (1st Dist. 1988); and Johnstowne Center Partnership v. Chin, 99 Ill.2d 284, 485 N.E.2d 480 (1983).  More particularly, under the Illinois "four corners" rule, the threshold inquiry is whether the contract is ambiguous. Hillenbrand v. Meyer Medical Group, S.C., 288 Ill. App.3d 871, 682 N.E.2d 101, 103 (5th Dist. 1997); Ford v. Dovenmuehle Mortgage Inc., 273 Ill. App.3d 240, 651 N.E.2d 751, 755 (1st Dist. 1995).

If a contract is ambiguous it should be construed against the drafter.  Scudder v. Jack Hall Plumbing and Heating, 302 AD2d 848, 756 NYS2d 330 (3d Dep't 2003).  This contract is not ambiguous.  By its terms, The Agreement can be terminated, prior to June 1, 2010, only in four ways.

> Notwithstanding the foregoing, the Employment period shall terminate prior to such date as follows: (a) upon written notice of Employee's Resignation for Good Reason; (b) Upon 30 days prior written notice of Employee's resignation without Good Reason; (c) Upon Employee's death or permanent disability or incapacity (as determined by the Board in its good faith judgment), or (d) upon written notice by the Company that is terminating the Employment Period for Cause.

(Pltf's Ex. 8, p. 2).

In the "Definitions" portion of The Agreement, "cause" is defined as follows:

> "Cause" means the commission of a felony or a crime involving moral turpitude or the commission of any other act involving dishonesty, disloyalty or fraud with respect to the Company.

The Court reviewed the defendants' Post Trial Memorandum of Law to discern what acts the defendants contend constituted disloyalty on the part of the plaintiff. In the Table of Contents, the defendants list the following seven acts alleged by them to be dishonest and disloyal acts on the part of Robert Cappiello.

I. Plaintiff's failure to advise Defendant ICD that his "home" office was not, in fact, Plaintiff's residence constituted a fraudulent, dishonest and disloyal act warranting the termination of the Employment Agreement.

II. Plaintiff's failure to acquire a contact name for HGTV from a former colleague at Reed Publications to pursue their participation in the Housewares Design Awards and his representation to Defendant ICD that he did, in fact, do so constituted acts of disloyalty and dishonesty warranting the termination of the Employment Agreement.

III. Plaintiff's failure to oversee and maintain the accounts of several ICD advertisers, resulting in the loss of at least one account, constituted an act of disloyalty and dishonesty warranting the termination of the Employment Agreement.

IV. Plaintiff's failure to complete the editorial calendars and rate sheets for ICD's publications for the 2008 fiscal year constituted an act of disloyalty and dishonesty warranting the termination of the Employment Agreement.

V. Plaintiff's failure to represent ICD at a hotel industry trade show in New York, New York by engaging with potential advertisers or customers during the trade show constituted an act of disloyalty and dishonesty warranting the termination of the Employment Agreement.

VI. Plaintiff's failure to create a conference for high level executives in the hospitality industry when instructed to do so constituted an act of disloyalty dishonesty warranting the termination of the Employment Agreement.

VII. Plaintiff's conversation with William McGloughlin (sic) in December, 2007, wherein he advised another ICD employee that it

41

was not his intention to utilize best efforts on behalf of Defendant ICD business, constituted an act of dishonesty and disloyalty warranting the termination of the Employment Agreement.

**(1)  As to Alleged "Disloyalty"**

Illinois law defines "disloyalty" as "acts of unfaithfulness and gross misconduct."  <u>Boock v. Nappier</u>, 3 Ill. App.2d 19, 120 NE2d 244 (1984).  Webster's Third New International Dictionary defines "disloyalty" as "lack of adherence to vows, obligation or promises" and "a violation of allegiance."

Palcek advised the plaintiff that he was being terminated for disloyalty based upon one event; namely, what the plaintiff told William McLaughlin at the 2007 ICD Christmas party. The plaintiff told McLaughlin that:  (1) he was unhappy at ICD because they were not permitting him to do the job he was hired away from Reed Exhibitions to do, (2) he was worried that ICD would not renew his contract if he was not put in a position where he could make enough money to justify his salary, and (3) he would not quit as he had a contract with ICD that he intended to honor.  These are not acts of disloyalty.

The Court notes that McLaughlin himself testified in his deposition, which was read into the record, that the plaintiff's conversation with him does not constitute disloyalty.  (Tr. at 650). Also, Schultz testified that he had no knowledge of any actions by Cappiello of disloyalty against the company.  (Tr. at 650).

The Court finds that there was no proof presented of any "disloyalty" on the part of the plaintiff Robert Cappiello and the plaintiff was not terminated because of disloyalty.

**(2)  As to Alleged "Dishonesty"**

What does "dishonesty" mean in the context of an employment agreement?  In this

regard, the Court reviewed the recognized authorities to define this term.  In the Merriam

Webster Collegiate Dictionary, Tenth Edition, being "dishonest" implies a wilful perversion of

the truth in order to deceive, cheat or defraud.  In Webster's Third New International Dictionary,

being "dishonest" is characterized by lack of trust, honesty or truthfulness or by an inclination to

mislead, lie, cheat or defraud.  Interestingly, in Black's Law Dictionary, Ninth Edition, when

reviewing the words "dishonest act", the reader is advised to "see fraudulent act."  The words

"fraudulent act" are defined as conduct involving bad faith, dishonesty, a lack of integrity or

moral turpitude.

The only evidence adduced by the defendant ICD as to alleged "dishonesty" is the

testimony by Palcek that he "felt" that the plaintiff did not call a woman named Beth Blake at

Reed Elsevier Co.  The plaintiff testified that he did call Beth Blake.  No evidence to the

contrary was adduced at the trial.  The ICD witnesses had no knowledge of whether Cappiello

did or did not call her.  Nor did the defendant call Beth Blake as a witness.   Interestingly, Palcek

testified that he never said that Cappiello was dishonest, only as it related to the Employment

Agreement.  (Tr. at 888).  The Court finds that the defendant produced no evidence that the

plaintiff Robert N. Cappiello committed any act involving "dishonesty" with respect to his

activities with and for the ICD company.

### (3)  As to the Defendants' Allegation of "Disloyalty" and "Dishonesty" on the Part of the Plaintiff as Set Forth in Their Post-Trial Memorandum

Finally, the Court has reviewed all 7 accusations of disloyalty and dishonesty on the part

of Robert Cappiello.  After such a review, the Court finds that the <u>all</u> of these assertions are

without merit.

## I.  The "Home Office" Contention

There is no evidence in this record that the plaintiff ever misled anyone at ICD about the location of his off-site office. The fact that apparently, he was living at this off-site office with a woman who was not his wife is irrelevant, with regard to the material issues in this case. In addition, the undisputed evidence at the trial was that ICD had an established policy of permitting its employees to work from off-site offices outside of the main ICD office in East Setauket, New York. The record indicates that co-employees Palcek, Evans, Andy Luchesi, Stacy Silver, Holly Kaye and Alan Rolerio all worked at off-site offices. In addition, Palcek testified that he did not prohibit the plaintiff's activities in this regard.

## II.  The Reed Elsevier Publication Contact Name

Palcek's contention that the plaintiff was being terminated for "dishonesty" because he felt that the plaintiff did not call Beth Blake is as previously discussed without merit. The plaintiff testified unequivocally that he did call Beth Blake and there is no evidence to the contrary.

## III., IV., and VI.  The Alleged Acts Involving the Plaintiff's Work History

The Court has reviewed these various work-related allegations and finds that none, either individually or collectively, even if established, would constitute disloyalty or dishonesty.

## V.  The Hotel Industry Trade Show

The evidence established that during this New York City industry trade show, the plaintiff spent a large part of the time in the ICD booth. However, the evidence also revealed that he did spend a portion of his time walking the floor. He also gave a successful presentation to Wyndham at the New York City show. In any event, even if the plaintiff spent his entire time in the ICD booth, perhaps that would be inefficiency but it could not be considered disloyalty or

dishonesty.

### VII.  __The McLaughlin Incident__

As a main contention, the defendants rely on the conversations between the plaintiff and McLaughlin at the ICD 2007 Christmas holiday party.  At that time the plaintiff revealed his genuine concerns about continuing to work for ICD.  In no way could these truthful and somewhat understandable statements by Cappiello constitute disloyalty or dishonesty.  Any such assertion is, in any event, dispelled by McLaughlin's own testimony in his deposition that the conversations did not constitute disloyalty.

BY MS. DE VOE:

Q.     Based upon your professional definition of disloyalty, would you state that Mr. Cappiello, speaking with you about being unhappy - - I'm sorry - - about his being unhappy at ICD constituted disloyalty?

A.     Speaking about it, no.

Q.     Are you aware of anything in your own personal definition of disloyalty that Mr. Cappiello did while working at ICD that would constitute disloyalty?

A.     I'm unaware.

Q.     Do you recall being asked those series of question  and giving those series of answers?

A.     Yes.

Q.     Are those statements as accurate today as they were on the date of your deposition?

A.     As I expressed them there, yes.

> Q.    You are not aware of Mr. Cappiello taking any actions of disloyalty against the
>
> company, are you?
>
> A.    I have no knowledge.

(Tr. at 650, 651).

Accordingly, based on the evidence adduced at the trial, the Court finds that the plaintiff was not terminated for cause. The plaintiff was not terminated for "disloyalty" or "dishonesty". The Court finds that the plaintiff was terminated without cause, and this termination constituted a breach of The Agreement by the defendant ICD.

## C. **Damages – Breach of Contract**

### (1) **As to the Amount of Contract Damages**

#### (a) **Salary**

On June 11, 2007, the plaintiff commenced his employment with the defendant ICD and was terminated, without cause, on January 31, 2008. The contract provided for his employment by ICD until June 1, 2010. Therefore, when he was terminated there was a period of 2 years and 121 days remaining on the plaintiff's employment agreement, namely from February 1, 2008 to June 1, 2010.

A party that violates a contract with another is liable for all the direct and proximate damages which result from the violation. National Market Share Inc. v. Sterling National Bank, 392 F.3d 520, 525 (2d Cir. 2004). "Where a party breaches a contract, that party is liable to the non-breaching party for damages and the amount of damages must put the non-breaching party in as good a position as if the breach had not occurred." Boyce v. Soundview Technology Group, Inc., 464 F.3d 376, 391 (2d Cir. 2006). See also Oscar Gruss & Son Inc. v. Hollander,

337 F.3d 186, 196 (2d Cir. 2003) (stating that ". . . damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract.")  This rule, namely that the purpose of an award of damages is to put the plaintiff in as good a position as he would have occupied but for the breach of contract, is the rule in Illinois.  See Movitz v. First National Bank of Chicago, 148 F.3d 760, 761 (7th Cir. 1998).

Although a plaintiff need not prove his damages with authenticated certainty, but only with proof based on reasonable certainty, this is a classic case of proof of damages with mathematical certainty.  The parties agreed, by written contract, that the plaintiff's salary was to be $210,000 per year.  As such, as stated above, the plaintiff is entitled to the loss of his salary because of defendant's breach of The Agreement by terminating him without cause, from February 1, 2008 to June 1, 2010, a period of 2 years and 121 days.  For this period of time, the plaintiff is entitled to damages in the sum of $489,616.14 in lost salary.

**(b)  As to Commissions**

The plaintiff contends that he is "also entitled to at least additional $60,000 per annum in minimum commissions . . . in addition to whatever 'override commissions,' this Court deems just, proper and equitable . . ."  (Plaintiff's Post-Trial Memorandum of Law at p. 18).  The Court disagrees.

The Commissions paragraph in The Agreement is relatively clear and, in this Court's view, unambiguous.  Stated again, the commissions paragraph reads as follows:

> Employee shall be entitled to commissions (the "Commissions") based on performance, at a schedule to be determined upon the starting date (above).  However, it is the intent of the Employer to design a commission program which will reach $60,000 annually,

> based on performance of the Employee in achieving additional net
> sales for the Company.

Reviewing the plain language, the commissions paragraph initially says that the employee shall be entitled to commissions based on performance at a schedule to be determined. So that commissions have to be earned, "based on performance". The Court assumes that to earn commissions based on performance, there has to be some acknowledged, grading or writing commending or at least stating the plaintiff's performance entitling him to commissions. There is no such evidence. However, the initial sentence goes further and states that the performance is to be set forth in a "schedule to be determined upon the starting date", namely June 11, 2007. There has been no such schedule introduced in evidence.

The plaintiff points to the second sentence in the commissions paragraph, including the words "which will reach $60,000 annually." However, the entire sentence clearly indicates that while it is the intent of the employer to design a program which will reach $60,000 annually, there was no evidence of such a program produced at this trial. Further, the second clause of that sentence clearly indicates that any commissions are "based on performance of the Employee in achieving additional net sales for the Company." The Court finds that there has been no evidence introduced at this trial with regard to the plaintiff achieving additional net sales for ICD. So that, while The Agreement provides a contingent incentive for commissions reaching $60,000 annually, there is no evidence that the plaintiff fulfilled the required conditions, namely achieving additional net sales for the company.

Accordingly, the request of the plaintiff for additional breach of contract damages for commissions, in addition to salary, is denied.

**(c)  As to Health Insurance and Disability Insurance Premiums**

With regard to health insurance and disability insurance premiums, claimed as additional damages by the plaintiff, The Agreement provides as follows:

> In addition to the Salary and Commissions payable to Employee, Employee shall be entitled to the following benefits:
>
> **Health insurance and disability insurance as outlined in the ICD Employee Handbook.** Insurance is subject to employee contributions and to starting dates as per Company policy. Also outlined in the ICD Employee Handbook are benefits including, but not limited to, sick days, personal days, vacation days, etc. The first 90 days of employment shall be considered probationary, with no health insurance provided in the initial 90 days.

The initial wording states that the employee, the plaintiff, shall be entitled to the benefits of health insurance and disability insurance in addition to his salary and commissions. It further states that such benefits are "as outlined in the ICD Employee Handbook." The ICD Employee Handbook is in evidence as plaintiff's Exhibit 11. In the Handbook at page 12 it is stated:

> ## 2. BENEFITS SUMMARY
>
> The value of the benefits that ICD Publications provides to our employees amounts to a considerable sum each year in addition to the wages and salary. ICD Publications is certain that all employees will agree that the benefits program represents a solid investment in our employees and our company.
>
> ICD Publications provides medical, dental and term life insurance coverage to all full time employees after 3 months of employment. For Benefits purposes, full time employees are defined as those working over 30 hours per week on a regular schedule. ICD Publications pays administrative costs associated with the benefits program and all employee contributions are deducted in installments from semi-monthly pay.

Evaluating the terms in The Agreement and the ICD Employee Handbook, it is clear that the defendant ICD agreed to provide Cappiello with health insurance in the nature of medical and dental insurance. At the trial, Cappiello testified in detail about his payments for the medical

and dental insurance during the period covered by The Agreement. His testimony was to the effect that he paid or will pay the sum of $39,425.33 for medical insurance expended or to be expended for the period from February 1, 2008 to June 1, 2010. In addition, the plaintiff testified that he paid or will pay an additional sum of $3,545.59 for his dental insurance premiums from February 1, 2008 to June 1, 2010.

In opposition, ICD asserts that the plaintiff has presented no evidence other than his uncorroborated testimony that he is entitled to these damages. In fact, the plaintiff did offer a letter from a company called Accuwood in an attempt to corroborate these health insurance expenditures. This letter constituted unauthenticated hearsay and was not admitted. However, the Court credits the plaintiff's detailed testimony as to the monies expended and to be expended for medical and dental insurance premiums. While the plaintiff has the burden of proof with respect to these damages, the Court cannot ignore the fact that his testimony is undisputed.

Accordingly, the Court grants judgment in favor of the plaintiff Robert N. Cappiello against the defendant ICD Publications, Inc. with regard to the medical and dental premiums in the total sum of $39,425.33 for medical insurance premiums and $3,545.59 for the dental insurance premiums.

**D.** **As to the Tortious Interference with Contract Cause of Action**

To establish tortious interference with a contract, a plaintiff must prove: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) that the defendant intentionally procured a breach of the contract; and (4) damages to the plaintiff resulting from the tortious interference. White Plains Coat & Apron Co. Inc. v. Cintas Corp., 460 F.3d 281, 285 (2d Cir. 2006); Foster v. Churchill, 87 N.Y.2d 744, 749, 750,

642 N.Y.S.2d 583, 665 N.E.2d 153 (1996).

While tortious interference with an existing contract is a fairly common tort, in this case the factual basis is somewhat unusual. Here, the person accused of the tortious interference, namely Palcek, is the President, Chief Executive Officer and a stockholder of the corporation involved in the contract. This situation, when the alleged offender is an officer and stockholder of the corporation involved, leads to what is called "the economic interest defense." As stated by the New York Court of Appeals in Robbins v. Panitz, 61 N.Y.2d 967, 43 N.E.2d 615, 475 N.Y.S.2d 274, "[a] corporate officer is not personally liable for causing the corporation to terminate an employment contract 'unless his authority involves individual separate tortious acts'". See also A.S. Rampell, Inc. v. Hyster Co., 3 N.Y.2d 369, 378, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957).

This economic interest defense has been uniformly followed. See Murtha v. Yonkers Child Care Association, Inc., 45 N.Y.2d 913, 383 N.E.2d 865, 411 N.Y.S.2d 219 (1978) (citing Application of Brookside Mills, 276 A.D.357, 367, 94 N.Y.S.2d 509, 518 (1st Dep't 1950) ("[A] director of a corporation is not personally liable to one who has contracted with the corporation on the theory of inducing a breach of contract, merely due to the fact that, while acting for the corporation, he has made decisions and taken steps that resulted in the corporation's promise being broken."). "[A] corporate officer who is charged with inducing the breach of a contract between the corporation and a third party is immune from liability if it appears that he is acting in good faith as an officer [and did not commit] independent torts or predatory acts directed at another." Id. (quoting Buckley v. 112 Central Park South, 285 A.D. 331, 334, 136 N.Y.S. 2d 233, 236 (1st Dep't 1954)); see also S.F.P. Realty Corp. v. G.S. Rockaway Development, Inc.,

206 A.D.2d 417, 614 N.Y.S.2d 443, 444 (2d Dep't 1994) ("The defendants Lobel and David

Guela were the sole shareholders, directors, and officers of the above-named corporate

defendants. The actions taken by Lobel which created the breach of contract between the

plaintiff and the corporate defendants were clearly done in his corporate capacity, and no

independent tort or predatory acts directed at another have been alleged. Thus, Lobel cannot be

held liable on the theory that he induced the breach of contract"); Gottehrer v. Viet-Hoa Co., 170

A.D.2d 648, 649, 567 N.Y.S.2d 71 (2d Dep't 1991) ("A corporate officer charged with inducing

the breach of a contract between the corporation and a third party is immune from liability if it

appears that he acted in good faith as an officer and did not commit independent torts or

predatory acts against another.").

      In his Post Trial Memorandum, the plaintiff makes many charges against the defendant

David Palcek in support of his claim that Palcek committed independent torts or acted with

malice. However, the Court finds that there is no evidence in this record of any independent

tortious conduct on the part of Palcek leading to the plaintiff's termination. Accordingly, the

tortious interference with a contract cause of action against the defendant David Palcek is

dismissed.

**E.  As to Mitigation of Damages**

      Contrary to the defendants' assertions in their Post-Trial Memorandum of Law, there was

uncontroverted evidence adduced at the trial that the plaintiff has and continues to mitigate his

breach of contract damages after he was terminated by ICD. It is clear and undisputed that the

plaintiff contacted and consulted with recruiters in New York, Massachusetts, Ohio and Toronto;

he conducted searches on a number of online job search databases; he contacted his preexisting

contacts in the trade show and publishing fields; he sent out many resumes; and he went on a number of job interviews in a continuous effort to obtain other employment in a similar field. (See Plaintiff's Exhibits 67-69, 88).

Under the present economic situation it is understandable that a fifty year old high income executive has been unable to find similar work after being terminated by ICD. Accordingly, the Court finds that the plaintiff has sufficiently attempted to mitigate his damages caused by the breach of the contract resulting in his termination.

**F. As to Punitive Damages**

The plaintiff has established his sole cause of action sounding in breach of contract. The Court has dismissed his tortious interference cause of action against defendant Palcek. So as to clear the record, the Court is now denying any punitive damages in the breach of contract cause of action. It has now been generally held that New York law permits an award of punitive damages in a breach of contract claim only when a defendant's conduct "is part of a pattern directed at the public generally." New York Marine & Gen. Ins. Co. v. Tradeline LLC, 266 F.3d 112, 130 (2d Cir. 2001). See also TVT Records v. Island Def Jam Music Group, 42 F.3d 82, 93 (2d Cir. 2005). In this case, the Court finds that the conduct of ICD in breaching the employment contract with Cappiello was not aimed at the public generally. Thus, there can be no punitive damages awarded on the breach of contract cause of action.

**G. As to Attorneys' Fees**

Generally, in a case involving damages for a breach of contract, the Court would not address the issue of attorneys' fees. Nor is there any request for attorneys' fees set forth in the complaint. However, in the plaintiff's Post-Trial Memorandum of Law, the subject is raised on

pages 13 and 24. The Court assumes that this claim for damages was related only to the tortious

inference cause of action against Palcek, which has been dismissed. There cannot be a viable

claim for attorneys' fees in the breach of contract cause of action.

## H.  As to Prejudgment Interest

Under Illinois law, in a breach of contract cause of action, Courts have awarded

prejudgment interest when the damages are reasonable. <u>Campania Management, Inc. v. Rooks,</u>

<u>Pitts & Poust</u>, 290 F.3d 843, 854 (7th Cir. 2002). The rule as to prejudgment interest on a breach

of contract case was clearly enunciated by the Seventh Circuit in <u>Residential Marketing Group,</u>

<u>Inc. v. Granite Investment Group</u>, 933 F.2d 546, 549, 550 (7th Cir. 1991).

> The final issue is whether the judge was correct to tack on an
> award of prejudgment interest. Illinois law provides for such an
> award "for all moneys after they become due on any . . . instrument
> of writing," Ill.Rev.Stat. Ch. 17, ¶ 6402, and Granite concedes that
> its written contract with Residential was an instrument of writing
> within the meaning of the statute. It argues, however, that
> Residential's claim was not liquidated.
>
> *   *   *   *   *
>
> The statues does not require that the instrument of writing specify
> the exact amount due the creditor. It is enough if it contains a
> formula from which that amount can be computed with reasonable
> accuracy. <u>Zayre Corp. v. S.M. & R. Co.</u>, 882 F.2d 1145, 1157 (7th
> Cir. 1989). "[E]asy and exact computation" is the favored catch
> phrase. <u>Michigan Avenue National Bank v. Evans, Inc.</u>, 176
> Ill.App.3d 1047, 1061, 126 Ill.Dec. 245254, 531 N.E.2d 872, 881
> (1988).
>
> *   *   *   *   *
>
> Prejudgment interest is necessary to compensate the victim of a
> breach of contract or other wrong. In cases governed by federal
> law it is presumptively available. <u>Gorenstein Enterprises, Inc. v.</u>
> <u>Quality Care-USA, Inc.</u>, 874 F.2d 431, 436 (7th Cir. 1989). As
> pointed out in <u>Zayre</u> and <u>Empire Gas</u>, there is no reason why the

> *550 Illinois statute should be given a grudging interpretation, and the Illinois courts do not give it a grudging interpretation.  If the amount due under a written contract is determinable, so that the defendant can have a good (here a perfect) idea of the amount of prejudgment interest to which he may be liable if he does not resolve the case promptly, the plaintiff is entitled to such interest.

Also, "[u]nder New York law, prejudgment interest is normally recoverable as a matter of right in an action at law for breach of contract."  New Eng. Ins. Co. V. Healthcare Underwriters Mut. Ins. Co., 352 F.3d 599, 606 (2d Cir. 2003) (internal citations omitted).

Under Illinois law, "creditors shall be allowed to receive interest at the rate of five (5) percent per annum . . ."  815 Illinois Compiled Statutes Annotated 205 § 2.  Accordingly, the Court awards prejudgment interest in the amount of 5% to the plaintiff on the damages awarded in this decision from February 1, 2008.

## VI. CONCLUSIONS

(1)  The Court finds that the plaintiff has established his breach of contract cause of action and awards him damages on that cause of action as follows:

| | |
|---|---|
| Loss of Salary | $ 489,616.14 |
| Medical Insurance Premiums | $ 39,425.33 |
| Dental Insurance Premiums | $ 3,545.59 |
| Total Damages | $ 532,587.06 |

With prejudgment interest at 5% from February 1, 2008.

(2)  The Court finds that the plaintiff failed to establish his tortious interference cause of action against the defendant David Palcek and that cause is dismissed.

(3)  The Clerk of the Court is directed to enter judgment in favor of the plaintiff Robert N. Cappiello against ICD Publications Inc. in the total amount of $532,587.06 with prejudgment

interest at the rate of 5% from February 1, 2008.

(4)  The Clerk of the Court is directed to enter judgment on the tortious interference with contract cause of action in favor of the defendant David Palcek, dismissing that cause.

(5)  The Clerk of the Court is then directed to close this case.

**SO ORDERED.**

**Dated:  Central Islip, New York**
**August 19, 2010**

_/s/ Arthur D. Spatt_
Arthur D. Spatt
United States District Judge